Kuelkamp vs. Hidding.

## KUELKAMP VS. HIDDING

EQUITY — FRAUD. *For what misrepresentations a conveyance of land will be cancelled.*

31 503
86 167
31 503
103 144
31 503
54 LRA 447n

1. It may be true, in general, that the misrepresentations for which equity cancels a conveyance of land, are such as relate to the quantity, quality, situation or value of the property, or the pecuniary responsibility of the purchaser, or something of that nature.

2. But equity does not limit itself by strict rules and strict definitions in matters of fraud. It leaves the way open to redress wrongs committed by means of fraud, in whatsoever forms it may appear.

3. A misrepresentation producing terror and confusion of mind, unsettling the judgment, and depriving the party of the free use of the reasoning faculty, where such misrepresentation was purposely made in order to take advantage of the resulting fear and mental derangement to secure a hard and unconscionable bargain, *held* to be a fraud, against which equity will relieve, in a proper case.

4. While a sale and conveyance will not be set aside solely on the ground of inadequacy of price, yet such inadequacy, especially if gross, is evidence of fraud.

5. The complaint shows that when the plaintiff conveyed his lands to defendant, he was illiterate and ignorant of business; that he was agitated with fear by reason of misrepresentations as to his personal peril from the anger of his neighbors, artfully made to him by defendant to induce him to part with his property for less than its value; that the sale and conveyance were made hastily and in secret, giving plaintiff no opportunity to consult with friends or counsel; and that the price paid did not exceed one-third of the value of the lands. *Held*, on demurrer, that these averments show good ground for equitable relief.

APPEAL from the Circuit Court for *Racine* County.

Action to have certain conveyances of land from plaintiff to defendant annulled for fraud, and to have defendant adjudged to reconvey, etc.   The facts alleged in the complaint as the ground for this relief are substantially as follows:

The plaintiff has been for many years last past a resident of Burlington in said county; and on the 6th of December, 1871, he was, and for ten years immediately prior thereto had been, the owner in fee and in possession of certain lands in said county, described in the complaint.   On the 1st of December, 1871, he returned to his home in said town of Burlington, after a brief absence, and found his wife lying on the floor in an unconscious condition, and she shortly after expired.   A *post mortem* examination of her body was subsequently made by a physician of Burlington, at which plaintiff was present, and said physician said that the deceased came to her death from an injury upon the head.   An inquest was then held upon the body by a coroner's jury, which found that said deceased came to her death in the manner just stated.   Soon afterwards the defendant and his son came to the plaintiff's house, and defendant then and there represented to plaintiff that it was currently stated and generally believed that he (plaintiff) had killed his said wife (of which charge plaintiff was wholly innocent); that the people would come after him, and he would be arrested and imprisoned for killing his wife, if he himself was not killed by the people; that his life was in danger, and that it was necessary for his safety, and his only chance of safety, that he should dispose of and convey his property and leave the country.   Defendant further represented that one Lueck, of said Burlington, the chairman of the board of supervisors of said town, a man of position and influence in the community and in whom plaintiff had great confidence, had also said concerning the plaintiff that he must get out of the way, and that the people would not interfere with him for the next day or two if he would leave.   Defendant then and there further represented to

plaintiff that he was plaintiff's best friend; that he was advising him for his best interests and welfare in the matter, and desired to assist him in getting away from Burlington and out of this state; and that, for the purpose of assisting him to dispose of his property, and to facilitate his escape from threatened arrest and the violence of the people, he, defendant, would purchase of plaintiff the premises before described, for $1,500, and would retain $500 of that sum for the purpose of becoming bail for the plaintiff, which he stated would be necessary, as the latter might be arrested. Defendant at the same time further represented to plaintiff that he, plaintiff, must at once execute conveyances of land to him, said defendant, and that he would have deeds prepared immediately for plaintiff to sign. Plaintiff is a German, wholly unable to read or write English, very illiterate, and ignorant of the usages of business. At the time of the representations aforesaid, he was laboring under great excitement and depression by reason of the death of his wife, and said inquest and examination; and he was induced by said representations to believe that he was about to be arrested and imprisoned on said charge of murder, and was in great and instant danger of his life at the hands of the people, and that his only safety was to instantly leave Burlington and its vicinity, and to dispose of his property to defendant. Relying wholly upon said representations of defendant, and believing them to be made in good faith, for the purpose of befriending him, plaintiff, on the 6th of December, at Burlington, executed, acknowledged and delivered to defendant a warranty deed of the premises aforesaid, except a certain described portion thereof, of which he executed and acknowledged a quitclaim deed the next day, at the city of Racine, upon the further representation of defendant that in order to convey to him a full title to said premises it was necessary that plaintiff should instantly accompany defendant to Racine and execute a further conveyance; in pursuance of which representations plaintiff came to Racine with defendant on the last named day, arriving

Kuelkamp vs. Hidding.

there in the evening, and the same night was taken to some store or saloon in said city, and defendant then went for and returned with a notary public, bringing said last mentioned deed fully drawn and prepared, whereupon it was executed, acknowledged and delivered to defendant. Defendant thereupon paid plaintiff $250 in money, promised to discharge for him an indebtedness of $60, and also executed and delivered to plaintiff five notes for $150 each, dated December 6, 1871, and due, without interest, on the 1st of October in each of the years 1872, 1873, 1874 and 1875; and this was the only consideration received by plaintiff for said lands. The representations made by defendant as aforesaid, were false and fraudulent, in that plaintiff was not in immediate danger of arrest upon said charge, nor in any danger of personal violence or interference from the people, and his life was not in peril, nor his liberty in immediate jeopardy; and defendant well knew that his representations were false, and made them for the sole purpose of inducing plaintiff to execute said conveyances; and " in the exercise of an undue influence over the plaintiff, and taking advantage of the confidence reposed in him by plaintiff, by reason of plaintiff's long acquaintance with him, and by virtue of said representations and statements, as well as of the excited state of plaintiff's mind and the condition of alarm created by said representations, and of the circumstances aforesaid, all of which were known to defendant, and intending to cheat and defraud plaintiff," he induced and procured plaintiff to execute and deliver to him the conveyances aforesaid, without adequate consideration. The interest of plaintiff in the land so conveyed was, at the time of such conveyance, worth $3,000 and upwards, and this fact was well known to defendant; the consideration agreed to be paid for them was grossly inadequate, and plaintiff was induced to make said conveyances solely through undue influence and through fear and alarm created by the fraudulent representations of defendant. Before the commencement of this action plaintiff offered to return to defendant

his said notes, and each of them, and tendered to him the full amount of money received from him as before stated, together with all moneys laid out and disbursed by him on account of the indebtedness of plaintiff, with interest on the whole thereof, and demanded of defendant that he execute a quitclaim deed of the premises to plaintiff, but defendant refused said tender, and refused to execute such deed.

The defendant demurred to the complaint as not stating a cause of action, and appealed from an order overruling his demurrer.

*Johnson & Reilbrock*, for appellant, argued that a contract will not be set aside for misrepresentation unless it be, (1) of a material fact constituting an inducement to the contract; (2) of something in regard to which the one party places a known trust and confidence in the other; (3) of a matter of fact and not of opinion merely; and (4) of something of which the party making it has peculiar means of knowledge (Story's Eq. Jur., §§ 195, 200; *Smith v. Richards*, 13 Pet., 26, 37; *Smith v. Mariner*, 5 Wis., 551); and that the misrepresentations alleged in the complaint were not of this character. They further argued that if plaintiff, under the influence of the same representations, had sold his property at a sacrifice to some third person, he could not have maintained an action against defendant for damages, and therefore, by the test applied in *Mariner v. Smith*, he could not maintain an equitable action for alleged fraud based upon those representations. They also contended that in the absence of any averment that plaintiff's ignorance and excitement were such as to affect his capacity to contract, the other averments in relation to them are of no importance. *Farnam v. Brooks*, 9 Pick., 212.

*Fuller & Dyer* (with *Chas. H. Lee*, of counsel), for respondent, cited Willard's Eq., 170, 202–204; Story's Eq. Jur. §§ 192, 246; 1 Mad. Ch., 214; *Sears v. Shafer*, 2 Seld., 272; *Underhill v. Horwood*, 10 Ves., 249.

DIXON, C. J.   Counsel for the defendant are especially clever
and adroit in argument, and certainly make the most of their
side of the case; but we still think their demurrer to the com-
plaint was correctly overruled, and that the order appealed
from must be affirmed.   The authorities cited by counsel op-
posed are full to the points in all directions, that the complaint
states a good cause of action for rescinding the sale and can-
celling the conveyances on the ground of fraud, misrepresenta-
tion, false impressions produced, imposition, violation of trust
and confidence, undue influence obtained over the mind of a
weak and illiterate man, still further enfeebled by present
anxiety and excitement, or undue advantage taken of the
ignorance, necessity and distress of such a man, amounting to
oppression on the one side with no power of resistance on the
other, or whatever else, in the vocabulary of equity and of
equity lawyers, the true ground for relief may be said to be.
The complaint seems to reach out in all directions, and to pre-
sent and satisfy all these grounds; and, besides, the grossest
inadequacy of price is alleged.

Counsel for the defendant argue that the misrepresentation
must have related to the quantity, quality, situation or value
of the property sold, or the pecuniary responsibility of the
purchaser, or to something of that nature; otherwise equity
will not grant relief on that ground.   Such may be conceded
to be the general rule in equity, or the most frequent form of
misrepresentation met with in the books; but it does not follow
that there can be no other which will constitute the basis of
equitable interference and relief.   Equity does not limit itself
by set rules nor by precise definitions, particularly in matters
of fraud.   Fraud is so multiform as to admit of no such rules
or definitions; and hence equity always leaves the way open
to punish frauds, and redress wrongs perpetrated by means of
them, in whatsoever new form they may appear.   A misrepre-
sentation producing confusion and terror of mind, unsettling
the judgment and depriving the party of the reasoning faculty,

so that he cannot think or act deliberately or with knowledge and composure — such a misrepresentation purposely made in order to take advantage of the mental derangement and fear which ensues to secure a hard and unconscionable bargain, is certainly a fraudulent misrepresentation in the eye of a court of equity, and one against which that court will grant relief in a proper case. Such is the misrepresentation complained of in the present case. The sentiment or impulse of fear is a very overpowering one, especially in weak and uneducated minds; and to take unfair and dishonest advantage of it, whether produced by fraudulent misrepresentation or not, ought to be no less a fraud, in the consideration of equity, than to take such advantage of an insane person, a lunatic, or an idiot.

If the conveyances in the present case had been obtained from the plaintiff when under arrest by the mob, no doubt they would have been void, or could have been avoided on the ground of duress. If they had been obtained under the same circumstances with the addition of a threat to lynch or murder him, *a fortiori* would the same consequences have followed. How much better, upon the facts stated in the complaint, was the actual situation of the plaintiff, so far as the use and exercise of a free will and judgment were concerned, at the time the conveyances in question were executed? He was harrassed by the same tormenting fears, though less perhaps in degree and intensity. He was fleeing from the same mob, and from the terrors of the same lynch law, attended part of the way by the present defendant, who, under the guise of friendship, but in reality to accomplish his own sinister and selfish purposes, stimulated and nursed his fears, and urged him on in his flight. The defendant succeeded under such circumstances in obtaining conveyances of the plaintiff's farm for one-third its value, and yet it is said to have been no fraud on the part of the defendant.

If the defendant, with fraudulent intent, had caused or produced intoxication of the plaintiff, and so had obtained the

conveyances on the same terms, no one would doubt that equity would relieve against them. How does mental derangement, incapacity or pressure otherwise produced for like fraudulent ends, change or vary the application of the principle? It clearly appears to us that it cannot.

For the rest we make some extracts from the authorities cited by counsel for the plaintiff, which seem to us peculiarly applicable to the case.

The second kind of fraud mentioned by Lord HARDWICKE, in *Chesterfield v. Janssen*, 2 Vesey, Sen., 154, is that which "may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make, on the one hand, and no honest and fair man would accept, on the other; which are inequitable and unconscientious bargains; and of such even the common law has taken notice; for which, if it would not look a little ludicrous, might be cited 1 Lev., 111, *James v. Morgan.* A third kind of fraud is, which may be presumed from the circumstances and condition of the parties contracting; and this goes further than the rule of law, which is that it must be proved, not presumed; but it is wisely established in this court to prevent taking surreptitious advantage of the weakness and necessity of another; which knowingly to do is equally against conscience as to take advantage of his ignorance; a person is equally unable to judge for himself in one as the other. "

"To make any agreement valid, " says Judge Willard (Eq. Jur., 170), "requires the assent of the understanding of the several parties thereto. This implies freedom of action, as well as the exercise of reason, accompanied with deliberation; the mind weighing as in a balance the good and evil on either side. Every true consent supposes, first, a physical, second, a moral power; and third, a serious and free use of them. Hence it follows, that persons under duress, idiots, madmen and infants, are in general incapable of making contracts, either from a want of freedom of action, or an inability to judge of their own actions.

Kuelkamp vs. Hidding.

This disability is not in all cases total, but *sub modo* only. But the persons laboring under it are, at all times, the peculiar objects of the paternal guardianship and protection of a court of equity.

"It is upon this principle that courts of equity watch, with extreme jealousy, all contracts made by persons, *when there is any ground to suspect imposition, oppression, or undue advantage being taken by one of the parties ; or when one trusts to another with a blind and credulous confidence ; or when one of the parties, from whom an advantage has been obtained, was in circumstances of extreme necessity and distress.* Undue influence can hardly ever obtain its object without some degree of fraud; but the cases show it may exist without actual moral fraud. It has a nearer affinity to *duress* than to fraud, and in some cases it may contain a mixture of both."

The language of Judge Story is much the same. 1 Eq. Jur., § 192.

Speaking of inadequacy of consideration, Judge Story says it is not, of itself, a distinct principle of relief in equity ; and such is undoubtedly the correct rule. But gross inadequacy, such as "shocks the conscience," becomes, of itself, evidence of fraud. "As to the unconscionable nature of this bargain, I hardly know how to express it ; but must express it in terms that have been used by this court before; that, if the terms are so extremely inadequate as to satisfy the conscience of the court, by the amount of the inadequacy, that there must have been imposition, or that species of pressure upon distress, which in the view of this court amounts to oppression, this court would order the instruments delivered up, though courts of law might hold that judgment not within the sphere of their powers." Such is the language of Lord ELDON, in *Underhill v. Horwood*, 10 Vesey, 200, 210.

And Mr. Maddock says it has been held that a sale for one-half of the worth would be relieved against. 1 Mad. Ch., 269.

Considering all the facts and circumstances stated in the

complaint, therefore, the ignorance of the plaintiff of business, and of the customs and usages thereof, and his illiteracy, the disturbed and agitated condition of his mind caused by the misrepresentations which were made to him, his fears and anxiety lest he might be seized and summarily punished by the mob; and considering the secrecy of the transaction and its haste, the plaintiff having had no opportunity to seek or obtain the advice of friends or counsel; and above all considering the gross inadequacy and imposition in the price — we have no hesitation in saying the complaint states a strong case for equitable interposition, and for relief against the conveyances, and that the demurrer was properly overruled.

*By the Court.*— Order affirmed.