DERBECK, Appellant, vs. ALBRIGHT and another, Respondents.

*February 11—April 7, 1925.*

*Contracts: Parol evidence: Varying unambiguous written agreement by oral testimony.*

1. All oral agreements made between parties involving the subject matter of a written contract must be deemed to have merged in the written contract when executed.  p. 519.
2. An unambiguous written conditional sale contract for an automobile, and judgment notes calling for the payment of the balance of the purchase price in twelve monthly instalments, and providing that on default in the payment of any instalment the total amount of the balance would, at the election of the payee, immediately become due, could not be varied by a contemporaneous oral agreement that the purchaser could make lesser payments than called for by the notes and at the end of the year execute a new contract covering the unpaid balance.  p. 519.
3. Where one of the contracting parties at the time of the execution of a written contract had full knowledge of its terms, a contemporaneous oral agreement lost all force and efficacy. p. 520.

CROWNHART, J., dissents.

APPEAL from a judgment of the circuit court for Fond du Lac county: CHESTER A. FOWLER, Circuit Judge. *Affirmed.*

At the times herein mentioned the defendant *Albright* was a dealer in automobiles at Fond du Lac, Wisconsin. The plaintiff was a married woman, and in May, 1924, negotiated with one *Sharon,* defendant's agent, for the purchase of a machine, and in the course of such negotiations informed *Sharon* that she could pay down on the purchase price of the machine the sum of $600, the total purchase price being $1,325; and that she could pay on the balance only $35 a month and the interest.

The Fond du Lac Acceptance Company, of which one Shaw was the president, discounted conditional automobile

sales contracts and acceptances, provided the same did not extend over a period of one year.    In order to ascertain whether the Acceptance Company would make an exception in the instant case, *Sharon* drove the plaintiff and her son to the office of the Acceptance Company, the plaintiff and her son remaining in the machine while *Sharon* interviewed Shaw upon the subject.    Plaintiff testified upon the subject as follows:

"We drove to the bank; my son and I stayed in the car; he went in the bank; when he came out and got in the car he said they usually make out the contract for only twelve months, but he said it will be perfectly all right for you to pay $35 a month and interest and leave the rest slide by until the year slides by and then renew the contract.    He said they had done that before and it was perfectly all right.    I said if you are positively sure it is all right we will go to the house, and I paid him $30 down."

It also appears that on the same day the additional sum of $570 was paid on the purchase price.    Shaw testified that he told *Sharon* that the contract could not be extended over a period of one year.    A few days thereafter *Sharon* appeared at the plaintiff's home with the conditional sales contract and twelve judgment notes, each note being for the sum of $68.16, and one note becoming due at the end of each month during the succeeding year.    Plaintiff testified as to the oral conversation when the notes were executed as follows:

"When I signed the twelve notes I noticed he had $68 down, and I said you are asking me to sign papers where it said $68 and you promised me $35 and interest would be all right.    He said that is just their way of doing business and I thought you could sign the twelve and do as I told you, pay $35 and interest and let the rest slide by, and when the year is up we will renew the contract.    I said if that is all right I will sign them and it would be all right, but are you positively sure it will be that way, and he said absolutely."

A few days thereafter the contract and the notes were transferred without recourse to the Acceptance Company,

and when the first note became due plaintiff tendered to Mr. Shaw the sum of $35 and interest, which Mr. Shaw refused to accept. After the first note became due the car was seized by the Acceptance Company and sold under the conditional sales contract.

Plaintiff began her action in the municipal court of Fond du Lac county to recover the sum of $600, the amount paid by her upon the automobile, and based her cause of action on fraud. The trial court found that the plaintiff was induced by the fraudulent representations of *Sharon* to purchase the car and that she relied upon such fraudulent representations, and that by reason thereof she parted with her money; and as conclusions of law found that the plaintiff is entitled to recover from the defendant the sum of $600 and interest. Judgment having been entered in accordance with the findings, the defendant appealed to the circuit court, and upon a review of the record such court reversed the judgment of the trial court and ordered judgment for the defendant, with costs. Judgment having been accordingly entered, the plaintiff prosecuted an appeal to this court.

For the appellant there was a brief by *Gooding, Keck & Gooding* of Fond du Lac, and oral argument by *C. P. Keck.*

For the respondents there was a brief by *Duffy & McGalloway* of Fond du Lac, and oral argument by *John P. McGalloway.*

DOERFLER, J. Without reviewing the evidence, let it be said that we are satisfied that *Sharon,* the agent of the defendant, perpetrated a moral fraud upon the plaintiff. Upon returning to the automobile in which the plaintiff and her son were waiting while *Sharon* interviewed the president of the Acceptance Company, he falsely gave the impression that the Acceptance Company would be satisfied to receive $35 per month and interest, which would extend the time for the payment of the balance over a period considerably in excess of one year. Relying upon the representations of

defendant's agent that payments in the sum of $35 per month would be accepted, the plaintiff paid on the purchase price the sum of $600. In direct violation of the oral agreement between the parties, *Sharon* a few days thereafter presented to the plaintiff for her signature the conditional sales contract and the twelve notes, each note being for the sum of $68.16, and one of said notes becoming due at the end of each month during the year succeeding. The conditional sales contract, among other things, obligated the plaintiff to pay the balance in monthly instalments of $68.16, the last instalment to become due twelve months after date. The notes were judgment notes and were for the sum of $68.16 each, payable to the defendant, with interest. Each note contained the following provision:

"This note is one of a series of twelve purchase-money notes secured by chattel mortgage executed this day. If this note be not paid when due, then all of said series of notes shall immediately become due and payable, at the option of the holder hereof, without notice or demand."

When the notes were to be signed, and before they were delivered, the plaintiff discovered that they called for the payment of $68.16 and interest, each. *Sharon's* attention again was called to the agreement, and he then represented that that was the usual method pursued by the defendant in his business, and that the plaintiff could pay $35 per month and interest and let the balance slide until the end of the year, when a new contract would be made out.

The question presented on this appeal is whether the representations made by *Sharon* were such as to constitute a legal fraud. That a moral fraud was perpetrated is beyond question. In order to determine the question at issue we must not only take into consideration the representations that were made at and prior to the time the $600 was paid on the machine, but the entire transaction, which culminated in the execution of the conditional sales contract and of the notes. The contract itself was specific and called for the

payment of the balance in twelve monthly instalments. This contract was submitted to the plaintiff, and under the state of the evidence it must be assumed that she was familiar with the provisions thereof. The notes expressly provide for monthly payments in the sum of $68.16 and interest, and plaintiff was not ignorant of this fact. Moreover, these notes were judgment notes, and contained the usual provisions of instruments of that nature. Furthermore, each note contained a provision under which the total amount of the balance would, upon election of the payee, immediately become due upon default in the payment of any instalment.

It is contended by plaintiff's counsel that the actual legal fraud perpetrated by the defendant consisted in *Sharon's* statement that under the usual method of doing business by the defendant, the plaintiff, notwithstanding the express provisions of the contract and the notes, could make payments in the sum of $35 a month and interest, leaving the balance slide until the end of the year, when a further extension would be granted.

We have therefore two agreements, the one in writing and the other oral. Both agreements were entered into at substantially the same time. There is no ambiguity in the written contract, nor does it exist in the notes. Under a well established rule of law, all oral agreements made between parties involving the subject matter of a written contract must be deemed to have merged in the written contract when the contract is executed. Jones, Evidence (2d ed.) 545; *Manufacturers & M. I. Bureau v. Everwear H. Co.* 152 Wis. 73, 138 N. W. 624; *Greene v. American M. Co.* 153 Wis. 216, 140 N. W. 1130. When the parties to a contract enter into a solemn obligation, as was done in the instant case by the execution of the conditional sales contract and the notes, and where the language of these written documents is clear and express and leaves no room for doubt as to interpretation, it would create a dangerous precedent to hold that the oral contract shall govern and take precedence over the clear

and unambiguous provisions of the written instruments.  A contrary holding, instead of deterring the commission of fraud, would be conducive to the perpetration of fraud, and would greatly affect the force and standing of commercial paper and written contracts in general.

The original statute of frauds was enacted in 1677 in England, and in this country a similar statute has been enacted and is now in force in nearly all of the states 'of the Union.  These statutes were designed mainly for the prevention of fraud, and require the contracts coming within their purview to be in writing, the superior standing and dignity of written contracts as compared to oral contracts being thereby expressly recognized.  When the plaintiff, therefore, at the time of the execution of the written contract, had full knowledge of its contents, and with such knowledge executed and delivered the same, the oral contract lost all force and efficacy.

No case that in its facts substantially coincides with the instant case has been cited to our attention by counsel, nor have we had better success in our own research.  However, we have arrived at the conclusion above indicated, and feel satisfied that the rule as above stated will best subserve the ends of justice.  The judgment of the circuit court will therefore be affirmed.

*By the Court.*—It is so ordered.

CROWNHART, J. (*dissenting*).  The statement of facts in the main opinion is quite complete and I will not repeat.  It is said in the opinion: "We are satisfied that *Sharon*, the agent of the defendant, perpetrated a moral fraud upon the plaintiff."  I think it was that, and more.  It was a criminal fraud. *Palotta v. State,* 184 Wis. 290, 199 N. W. 72; *Corscot v. State,* 178 Wis. 661, 190 N. W. 465; *Stecher v. State,* 168 Wis. 183, 169 N. W. 287.

Derbeck v. Albright, 186 Wis. 515.   Dissent.

Fraud has been aptly defined as—

". . . a generic term, and embraces all the multifarious means which human ingenuity can devise, and are resorted to by one individual to get an undue advantage over another by false suggestions, or by the suppression of the truth. No definite and invariable rule can be laid down as a general proposition defining fraud, as it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated. The only boundaries defining it are those which limit human knavery." *Barr v. Baker,* 9 Mo. 840, 844.

It is said in 12 Ruling Case Law, 229, that—

"Fraud assumes so many different hues and forms that courts are compelled to content themselves with comparatively 'few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily on the conscience and judgment of the court or jury in determining its presence or absence."

Here the court concedes the fraud but satisfies its conscience by reference to a technical rule that, to be actionable, the fraud must relate to an existing or past fact and not to a promise of future conduct. This court has not always followed that rule with strictness. In *Knott v. Tidyman,* 86 Wis. 164, 167, 56 N. W. 632, Mr. Justice WINSLOW, speaking for the court, said:

"These cases present phases of human nature not pleasant to contemplate. A man, weak in mind and fond of liquor, falls into the hands of a designing and shrewd man whom he thinks to be his friend. The supposed friend plies him with liquor, plays on his fears as to the action of supposed creditors, threatens and cajoles him, until, in a state of intoxication and not realizing what he is doing, the victim at various times signs notes, chattel and real-estate mortgages, covering all his property, amounting to more than $3,000, without a shadow of consideration. That this constitutes fraud cannot be doubted. If courts cannot relieve against such impositions, they fail in an important part of their mission. But they can and do frequently relieve against just

such machinations.   *Kuelkamp v. Hidding,* 31 Wis. 503. See cases cited in the opinion of Dixon, C. J."

In that case there was an appeal to the conscience of the court.

But even if we apply the strict rule, it seems perfectly plain to me that the instant case falls within it.   The agent, *Sharon,* represented to the plaintiff that the banker said he would accept $35 a month as payment on the automobile, whereas in fact the banker told *Sharon* that he would not accept such payment.   The agent, *Sharon,* further falsely stated that it was their custom to draw the contract and notes to include full payment within a year, but that they would allow the smaller payments to slide along until the end of the year, when the contract would be renewed.   This was another false statement of a purported existing fact.   There was no such custom existing.   The defendant secured $30 down and gave a receipt, and shortly thereafter delivered the car, received $570 as a further payment, and drew up a written contract, which plaintiff signed.   This contract provided for the purchase of the car, the payment of $600 in cash, and the balance on delivery of the car.   This was on May 16th.   On May 19th he produced a conditional contract of sale and the notes, and for the first time the plaintiff learned that the papers provided for payment of $68 a month.   It was then that she protested, but was lulled into security by the false statement of fact that these papers were drawn in accordance with the custom.   She thereupon signed the papers, and also signed a paper representing that she was a dressmaker, earning $35 a week or $1,800 a year,—this, too, under a false statement of fact that it was the custom and quite immaterial as a matter of fact.

The plaintiff was a housewife of little education and no business experience.   She was dealing with a substantial business concern in her city, upon whose statements of fact she would naturally rely.   She was enmeshed in contracts and papers she did not understand.

O'Brien v. Rice, 186 Wis. 523.

Whoever reads the testimony will realize at once that this woman was weak and credulous, and as clay in the potter's hands. The agent, *Sharon,* could mislead her at will. He was somewhat smoother and more dangerous than Palotta, who went to prison (*Palotta v. State,* 184 Wis. 290, 199 N. W. 72), but equally effective in abstracting money from the credulous woman through his unscrupulous means. I think the evidence against the defendants in the *Corscot Case,* 178 Wis. 661, 190 N. W. 465, or the *Stecher Case,* 168 Wis. 183, 169 N. W. 287, was no stronger than against the defendant in this case. Yet in both these cases the defendants were convicted of crime.

If we are to indorse such cunningly devised frauds to prey upon the credulity of the unwary women of the state, I think we have opened the door pretty wide for disreputable business transactions. More than that, we have pointed out the exact method by which the weak and credulous may be robbed of their property without incurring the penalties of the law.