THE McCORMICK HARVESTING MACHINE COMPANY, Respondent, vs. HAMILTON and others, Appellants.

*January 31 — February 19, 1889.*

*Mortgages: Homestead: Duress: Parent and child.*

The evidence in this case is *held* (contrary to the finding of the trial court) to show that the mortgage sought to be foreclosed was executed, as to the homestead embraced therein, by the defendant wife under duress and undue influence exerted by means of threats that unless she so executed it the plaintiff would cause the imprisonment of her son for a crime of which the latter was not in fact guilty. The mortgage is therefore void as to such homestead.

APPEAL from the Circuit Court for *Richland* County. The facts are stated is the opinion.

For the appellants there was a brief by *L. H. Bancroft,* and oral argument by *Mr. Bancroft* and *H. W. Chynoweth.*

For the respondent there was a brief by *Eastland & Son,* and oral argument by *H. A. Eastland.*

The following opinion was filed February 19, 1889:

ORTON, J. This appeal is from the judgment of foreclosure of the following mortgage: By *Peter Hamilton* and *Bridget,* his wife, to the respondent company, on the south half of the northwest quarter of section 13, and the southeast quarter of the northeast quarter of section 14, town 10 N., range 1 W., to secure the payment of three notes given by *M. J.* and the said *Peter* and *Bridget Hamilton,* for $600, payable June 1, 1887; $600, payable June 1, 1888; and for $600, payable January 1, 1889,— dated November 20, 1885. The defendant *Bridget Hamilton* answered the complaint in the action by setting up substantially that the last above described forty acres was the homestead of herself and husband, *Peter Hamilton;* and that she was induced and unduly influenced to sign said mortgage, so far

as said homestead was concerned, by duress and threats of imprisonment of her son, the said *M. J. Hamilton*, for the crime of embezzlement; and that said mortgage in respect to said homestead is therefore void. The circuit court found against her on that issue, and rendered judgment of foreclosure as to all the land described in said mortgage. An appeal was taken to this court from said judgment by both *M. J.* and *Bridget Hamilton*, but the case of *Bridget Hamilton* alone has been brought to the attention of the court.

The ground relied upon is that the judgment is against the law and evidence. By force of what we deem is a very strong preponderance of the evidence against it, we are compelled to differ with the learned circuit court in its finding on this issue. The general facts, and the testimony on the issue of duress, are as follows:

Some time in the year of 1881, *M. J. Hamilton*, the son of the said *Peter* and *Bridget Hamilton*, became the agent of the respondent company, at Richland Center in this state, to sell its machinery. Until May, 1885, an annual settlement had been made with him and his accounts adjusted. Before that time the said *M. J.* had been subject to occasional and temporary insanity, and about that time he had given evidence of a return of that malady, and was wild and reckless in his sales and business, and the company had been notified by his family that they must send an agent to look after their business in his hands. Accordingly, William Varco, the general agent of the company, came there and examined his affairs, and induced his brother John to be associated with him in business by their advertisement, but left *M. J.* ostensibly to continue in it. The agent Varco at the same time induced the father of *M. J.*, the said *Peter Hamilton*, to become his security for the business left in his hands. About the 18th day of November thereafter, his brother John notified the company that *M. J.* had again

become insane, and had been taken to the insane hospital. The said Varco again came to look over his business and adjust his accounts. He found that *M. J.* owed the company about $1,200, and had in his hands about $600 worth of the company's property, consisting of various articles and notes received for machinery. He turned over this property to *M. J.*, and charged him with a deficiency to the company of $1,800, for which he demanded mortgage security of the father and mother, *Peter* and *Bridget Hamilton*, upon their whole farm, including their homestead. He charged *M. J.*, who had then returned, with being guilty of embezzlement. When asked by *M. J.* if he thought he could find him guilty of embezzlement in consequence of his having fallen short in his accounts he cited the case of a man who was found guilty of embezzlement under similar circumstances, and said if the mortgage was not given he would "crack his whip." The agent and witness Varco gave this version of that threat: "Finally I said, 'I am getting tired of this. If I cannot settle this, I will crack my whip.'" This threat evidently excited *M. J.* very much, and put him in great fear.

Varco had several interviews with the mother, *Bridget Hamilton*, and tried to induce her to sign the mortgage for the homestead, and she as persistently refused, but offered to sign the mortgage for the balance of the farm, and Varco refused to take such a mortgage. She testified as follows: "He wanted me to sign a mortgage on my homestead, or he would send my son to state prison for one year or ten. He said, if I did not give a mortgage, he would have to go to state prison one year or ten. He said, 'Don't you think more of your son than the *McCormick Company* does?' I said, 'I ought to.' He replied, 'Would you rather sign a mortgage on your homestead than to have your son go to state prison for a year or ten? . . . The *McCormick Company* knows the law and they will use it.' He said, if

I did not sign the mortgage he would commence proceedings at once, and send my son to the state prison. 'Would you not rather sign the mortgage than to have your son go to state prison?' When Mr. Varco first suggested taking the mortgage, I offered to sign a mortgage for all the land but the homestead forty, including twenty acres of wheat and some grass and corn; but he insisted he wanted all the farm, or send the boy to prison." On cross-examination she repeated that he said: "Your son must go to state prison unless you sign the mortgage. Don't you think more of your son than the *McCormick Company?*" She testified further: "I put my name on the mortgage entirely against my will, and I told them so then. I never would have signed for any other purpose but to keep my boy from state prison, and I believed, did I not sign it, they would send him to state prison. I did not do it willingly. I was forced to do it."

James Hamilton, brother to *M. J.*, testified as follows: "They were talking there all the evening. He [Varco] wanted her [his mother] to sign the mortgage. She told him she would not. He wanted to know of her if she did not think more of her son than the *McCormick Company* did. Then he told her he wanted to know why it was she would not sign the mortgage, and she told him that she did not think she had any reason to; that her son had not done anything, and that she did not owe anybody; and it seemed to me like he got mad, and he jumped up and said *he would crack his whip*, and started out of the office. I asked him, provided my mother did not sign that mortgage, what they wanted to do with my brother. He said they had one fellow *in* for three years on just such a case as that, and this was a good chance for another; but it was not him who would execute it; that it would be the company." This explains what Varco meant when he threatened that he would turn it over to the company. James told his mother

this conversation, and he said to his mother: "For God's sake, if it is a case of embezzlement and they can imprison him, don't have him imprisoned for this place."

William Varco, the agent, testified as follows: Supposing a certain state of facts, he said: "And that, in my opinion, it would constitute embezzlement. *Mrs. Hamilton* asked me what would be the penalty if he was guilty of embezzlement. I told her that I did not know; that I understood it to be a penitentiary offense, but, as to the penalty, that would be with the court and jury." This language clearly means, that *it would be* with the court and jury to fix the penalty in the case of her son. He testified further: "She said, 'Would you send *Mike* to the penitentiary?' I said, 'No.' I asked this mortgage in a settlement of this business between ourselves, to stop litigation of any kind. She said she did not think that, in view of the amount of business he had done for the *McCormick Company*, that they would send him to the penitentiary. I said, of course I could not tell whether they would be disposed to or not, but if they could, without a superior power to prevent it, would you expect them to think more of your son than you? Finally I said: 'I am getting tired of this. If you cannot settle this, *I will crack my whip.*' I told *Mrs. Hamilton* I thought it would be better to settle up and avoid litigation. I supposed that, as a matter of course, if they did not settle up, they would commence some suit." When asked: "Did not you tell him [*M. J.*] that you thought he was liable for embezzlement?" he replied: "I told him I thought he was." He further testified "that he was not positive that *Mrs. Hamilton* did not say that it was entirely against her will and against every vein in her body that she signed the mortgage." When asked: "You say that you never stated to *Mrs. Hamilton* that it would go pretty hard with the boy if he did not sign the mortgage?" he replied: "I won't

say any such thing. I rather think *it would* have gone hard with the boy. He would have had a lawsuit on his hands." When *Mrs. Hamilton* still insisted, as he testified, that if he was even guilty of embezzlement he had done so much for the company that they would not prosecute him, he again said: "Do you think they would think more of your boy than you do?" This testimony of Varco, the agent of the company, corroborates the testimony of *Mrs. Hamilton* in all essential particulars, and she is corroborated further by her sons in respect to his charging *M. J. Hamilton* with the crime of embezzlement, and one of them corroborates her testimony that this charge was brought to her knowledge before she signed the mortgage to induce her to sign it.

It is true that the finding of the circuit court in such a case, or in other cases, ought not to be disturbed by this court without a clear preponderance of the testimony against it, and that on the question of the credibility of the witnesses the trial court or the jury has superior advantages and better means of determining it than this court, having seen the witnesses and heard them testify, yet, when the testimony, as in this case, not only very strongly preponderates against the finding but is all one way against it, and the material facts stand admitted by the agent of the company who made the threats and was guilty of the duress, then the duty of this court is clear to find the facts otherwise and reverse the judgment. It is perfectly certain that *Bridget Hamilton* would never have signed the mortgage which included their homestead if Varco had not threatened that if she did not he would prosecute and imprison her son *M. J. Hamilton* for the crime of embezzlement, and that she signed it for no other consideration than to prevent his imprisonment for that pretended crime, notwithstanding she did not herself think that he was guilty of any crime whatever. She evidently feared that

the power of the company and Varco might be sufficient to effect such a result. The evidence tends to show that, after having known for some time, while *M. J. Hamilton* was acting as the agent of the company, that he was subject to occasional and temporary insanity, and having kept a superintending control of his business, and brought him to frequent settlements,—most probably on that account,—this general agent of the company made an accounting of this young man's business when he was again suffering to some extent his terrible malady, and finding a balance of $1,200 against him, and turning over to him articles of personal property and notes valued at $600 which belonged to the company, compelling him to purchase them to swell his deficiency to the company, and after having exacted the security of his father, who owned a farm of 120 acres, so far as we know unincumbered, and after having been offered a mortgage on eighty acres of the land with twenty acres of wheat upon it, probably ample security for the $1,800, that he then threatened this unfortunate boy with a prosecution for embezzlement, which added the excitement of fear to his deranged intellect, and threatened his mother, whose love. and sympathy for him were so great that she would become homeless rather than he should be sent to prison for such a crime. She believed that if she did not sign away their homestead he would be prosecuted and imprisoned for that crime. If Varco had not virtually admitted in his testimony that he did so threaten, the facts that he was so persistent to have the mortgage embrace the homestead, and refused to take it if it did not, and that she as persistently refused and delayed and was most earnestly unwilling to do so, and that she finally signed the mortgage very reluctantly, would naturally suggest the inquiry, What caused or induced her to do it? What other cause was there or could there have been, if it was not to keep her son from imprisonment for some pretended crime

with which he had been threatened? She had no occasion to fear anything else. She could see no way by which they could pay the $1,800, and she expected if she signed the mortgage she would sooner or later be turned out of her homestead. The testimony of Varco alone, under such a most reasonable probability, is amply sufficient to establish the fact that he did so threaten her with the imprisonment of her son. *M. J. Hamilton* was not guilty of embezzlement, or of any crime, and Varco knew it. There is no testimony in this case that casts even a suspicion of crime upon him, and the presumption of the law is that he has been guilty of no crime.

In view of these facts, the law is well settled that the mortgage, so far as the homestead is concerned, is absolutely void. If these facts did not technically constitute *duress* of imprisonment, for which contracts will be set aside, *in equity* it is very clear that *Bridget Hamilton* was so put in fear and under terror by the repeated threats of Varco that they would imprison her son, and she was so unduly influenced and overpowered by them, that she did not sign away her homestead of her own free will, and such act should be declared void. *Fay v. Oatley*, 6 Wis. 42; *Bogie v. Bogie*, 37 Wis. 373; *Kuelkamp v. Hidding*, 31 Wis. 503; *Watkins v. Brant*, 46 Wis. 419; *Lefebvre v. Dutruit*, 51 Wis. 326; *Smith v. Smith*, 60 Wis. 329. "When one is under the influence of extreme terror, or of threats, or of apprehensions, short of duress, his acts may be avoided, for in cases of this sort he has no free will, but stands *in vinculis.*" 1 Story, Eq. Jur. § 239. But the modern doctrine of *duress* is established where actual or *threatened* violence or restraint contrary to law compels one to enter into or discharge a contract. Bouv. Law Dict. "When there is a fear of imprisonment, excited by threats, it is *duress.*" Will. Eq. Jur. 209. "Terrifying a woman by threats of prosecuting her husband for alleged embezzlement is such

coercion as to avoid a transfer of her property thus obtained." *Ibid.; Richards v. Vanderpoel*, 1 Daly, 71. In *Eadie v. Slimmon*, 26 N. Y. 9, Slimmon went to the house of Eadie and charged him with embezzlement committed while he was in his employment, and demanded of his wife that she should assign to him a policy of insurance she held on her husband's life, or that her husband should be arrested at once and taken to prison. She became frantic with grief and terror, and finally assigned the policy. It was set aside. "A threat to procure the arrest and imprisonment of one's son under a false criminal charge, and reasonable ground to believe that such threat will be executed, probably constitute duress." *Schultz v. Culbertson*, 46 Wis. 313. In *Harris v. Carmody*, 131 Mass. 51, the father gave his note of $1,000, and secured it by mortgage on his real estate, induced by the threat that his son would be prosecuted and imprisoned for the crime of forgery if he did not do so. It was held that the mortgage should be avoided. It is a maxim, "If a man menace me that he will imprison or hurt in body my father *or my child* except I make unto him an obligation, I shall avoid this duress as well as if the duress had been to mine own person." Bac. Max. 18; *McClintick v. Cummins*, 3 McLean, 158.

There seem to be very few cases where it is held that a contract or conveyance may be avoided by duress to one's child, but many cases by duress to one's husband or wife, and such seems to have been the limit by the older authorities. But natural affection is as strong towards one as towards the other, and the same moral obligation of mutual protection exists between them, and the threats of personal injury to the child would be as great an inducement or undue influence as to the husband or wife, and there is no possible reason for the exception. The maxim *persona conjuncta æquiparatur interesse proprio*, under which it has been so often held that duress to the wife is the same as to the hus-

band himself, may well embrace duress to a child to influence the parent. It is sufficient that the threat of imprisonment of the child produces such fear and terror of the parent as to overpower his will and coerce his assent against every mental power of resistance.

The contract is then void by every principle of equity. It is the worst species of fraud, because it attacks the weakest point of human nature, and appeals to natural affection. What will not a mother do to save her child from imprisonment for crime of which he is not guilty? We cannot but regard this case as one of the strongest that would be likely to occur. The homestead is sacred to the wife especially, and should not be taken away without her signature to the deed as an act of her own free will. She knew that her poor insane son was not guilty of any crime, but she did not know but that he might be arrested and imprisoned on the pretended charge of embezzlement, baseless as it was, and suffer great bodily as well as mental harm, and loss of reputation and character. She kept pressing upon Varco: You would not prosecute and imprison my son, would you? No; but what the company might do he could not say. But would you think the company thought more of your son than you do? He kept before her all the time the fear that the company would do so.

The circuit court ought to have found the issue that *Bridget Hamilton* signed the mortgage by threats, duress, and undue influence, so far as the homestead was concerned.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded with direction to render judgment of foreclosure of the mortgage as to the first-described eighty acres only, and enter judgment as to the other or homestead forty acres that the mortgage be canceled, set aside, and held for naught, on the ground that it

was procured as to said homestead by threats, duress, and undue influence.

The following opinion was filed February 27, 1889:

ORTON, J.    Since handing down the opinion in this case, my attention has been called to the fact that there was a mistake as to the southeast quarter of the northeast quarter of section 14, town 10 N., of range 1 W., being the homestead of the said *Peter Hamilton* and *Bridget Hamilton*, his wife, and that there was a mistake in this respect in the record and in the opinion and judgment of this court.    The opinion and judgment of this court is therefore hereby modified in this respect, so that it may have the effect to have the judgment of the circuit court declare the said mortgage void as to whatever homestead the said *Peter Hamilton* and *Bridget Hamilton*, his wife, or either of them, had and held in any part of the mortgaged premises, not exceeding forty acres, whatever its description may be.    The opinion and judgment in this respect will stand as so corrected, and the circuit court is ordered to render judgment according to this correction, unless the specific description of said homestead can be certainly ascertained, in which case such description should be inserted in the judgment declaring the mortgage void in respect to the same, and the judgment of foreclosure should be entered as to the balance or residue of the mortgaged premises, whatever its description may be by this correction.