BENNETT, Appellant, vs. LUBY, Respondent.

*September 7 — November 29, 1901.*

*Appeal: Questions considered: Incomplete judgment: Partnership: Settlement: Duress.*

1. Where the parties have agreed to the entry of an incomplete judgment, and there is no exception or assignment of error raising the question of its sufficiency on appeal, the supreme court will not disturb the judgment on that ground alone.

2. Evidence to the effect that plaintiff accused defendant, his copartner, of appropriating firm property to his individual use, stating that he (plaintiff) had evidence enough to send defendant to state prison, and would push him through unless a settlement was made, and that defendant denied the charge but to prevent further trouble and secure the continuance of the firm business turned over $200 cash, charged himself on the books of the firm with $250, and gave a note for $550, is *held* insufficient to show duress, where plaintiff was a young man of considerable business experience, and two weeks elapsed between the making of the first charge and the settlement, and there was nothing to prevent the defendant from consulting friends.

3. The evidence in such a case (stated in the opinion) is *held* to show that the note was given to the partnership and not to the plaintiff personally.

APPEAL from a judgment of the circuit court for Dane county: R. G. SIEBECKER, Circuit Judge. *Reversed.*

This is an action in equity, commenced in the circuit court for Rock county, to dissolve a partnership and close up the business thereof. The plaintiff and one Cram went into the boot and shoe business in Janesville in April, 1896, as copartners, under the name of Bennett & Cram, and conducted said business until March 26, 1897, when the defendant, *Luby*, who had been a clerk for the firm, bought out Cram's half interest for $3,400, and the business was thereafter conducted under the name of Bennett & Luby until November 8, 1897, when this action was brought. The complaint charged the defendant with appropriating large

amounts of partnership money and property to his own use, exceeding his proportion thereof. The answer denied this charge, and contained three alleged counterclaims; the first being a counterclaim for $400, arising out of the purchase of Cram's half interest in the business, which purchase the defendant alleged that the plaintiff undertook to, and did, conduct for the defendant, and represented to the defendant that the said half interest cost $3,400, when it in fact cost but $3,000, and the defendant, in ignorance of the actual cost, paid $3,400 to the plaintiff for the same. The second counterclaim was to the effect that the plaintiff made a false and fraudulent inventory of the property of the firm at the time the defendant made his purchase, which inventory showed that the business and property were worth about $1,300 more than they really were worth. The third counterclaim was to the effect that in October, 1897, the plaintiff falsely charged the defendant with having secretly and fraudulently taken $2,000 worth of goods and moneys of the firm, and threatened the defendant with criminal prosecution therefor, and forced the defendant, by such threats and duress, to charge himself on the books of the firm with $250, and pay into the firm the sum of $200 in cash, and give his note to the firm for $550 to settle said false accusation, all of which sums the defendant claimed to recover upon the accounting in this action.

Upon the commencement of the action and without notice the plaintiff applied for his own appointment as receiver; and he was appointed as such receiver by the court, took possession of the stock, and thereafter sold it under the order of the court.

The action was referred May 19, 1898, to William B. Noyes, Esq., to take testimony and state an account between the parties; and considerable testimony was taken, and Referee Noyes filed his report December 31, 1898, stating an account between the parties. Thereupon the defendant moved to

set aside said report and re-refer the cause, pending which motion the venue of the action was changed, upon the defendant's affidavit of prejudice, to the circuit court for Dane county; and in November, 1899, the last-named court made an order referring the action to Rufus B. Smith to hear, try, and determine the same and state an account between the parties. Additional testimony was taken before Referee Smith, and on August 13, 1900, he filed findings of fact and conclusions of law as follows:

"(1) That the late firm of Bennett & Cram made an inventory of their stock, assets, and liabilities on January 3, 1897, which said inventory is in evidence; and I find it is substantially a full, true, and correct inventory of the condition of said firm at that date.

"(2) That on or about the 26th day of March, 1897, Mr. Cram sold his one-half interest in said business to *Mr. C. C. Bennett* for the sum of $3,400, $400 of which was an allowance by Cram to *Bennett* for his individual services in said business; that in negotiating said purchase *Mr. Bennett* did so for the defendant, *D. J. Luby*, and at his (*Bennett's*) request; that *Bennett* represented to said *Luby* that he had paid Cram $3,400 therefor, withholding from said *Luby* the fact that an allowance of $400 to him as aforesaid was a part of said $3,400.

"(3) That before said purchase and sale it was agreed between the plaintiff and defendant in this action that upon such purchase said parties should continue said business as equal partners under the firm name of Bennett & Luby, which they did until November 8, 1897, when said plaintiff was appointed the receiver of said firm on the *ex parte* application of said plaintiff.

"(4) That on March 24, 1897, and before said sale and purchase, said *Bennett* made what purported to be an inventory of the property, assets, and liabilities of Bennett & Cram at that date; that Cram did not participate in making said inventory, and would not sell his half interest based upon said inventory, and stated that the sale and purchase, if made, must be based upon the January inventory, and that the sale and purchase was made upon the January inventory; that said plaintiff told said Cram, when negotiating for said purchase, that the inventory of March 24th showed

a shortage or loss of $1,000 by said firm since the January inventory had been made, but said Cram refused to accept said statement as true, and said, if true, that he (*Bennett*) was responsible for it, and knew where the money had gone.

"(5) That *Bennett* had sole charge of the business of Bennett & Cram, and that the books of said firm were kept by the former; that by an investigation of the books and business of Bennett & Cram, since made, as appears by the evidence in the case, there was an actual shortage or loss of about $1,432.10 between January 3, 1897, and March 24, 1897; and I so find as a fact.

"(6) I find that said inventory of March 24, 1897, is not correct, or even a substantially correct inventory of the business and condition of Bennett & Cram when made; and I find that all shortage in the business of Bennett & Cram and that of Bennett & Luby is concealed in some manner in that inventory of March 24th made by the plaintiff, and that the plaintiff, *Chester C. Bennett*, is responsible therefor; that it is a stuffed and false inventory.

"(7) I find that the loss and shortage of Bennett & Luby in their business between March 27 and November 8, 1897, based upon said inventory of March 24, is at least the sum of $1,789.49, exclusive of the loss of profits made in said business on sales aggregating $16,871.96, which profits also seem to be lost. And I find that at the commencement of the business of Bennett & Luby a shortage existed, which was concealed by said false and erroneous inventory, which was sufficiently large in amount to account for all the shortage subsequently discovered, and for the loss of profits.

"(8) I find that the inventory of March 24th (see Exhibit G) was changed after it was made by tearing therefrom a leaf (page 86), and by continuing said inventory on page 87, and that said leaf was torn from said inventory by said plaintiff and the entries on page 87 made by him to serve some purpose of his own, to the injury of said defendant, thereby greatly swelling said inventory in amount.

"(9) I find that the charge made by said plaintiff in his complaint in this action, and by his testimony given in this case, that said defendant had surreptitiously and clandestinely taken of the property of said firm in goods or money, or both, to the amount of $2,000, or any other sum, is unsupported by the evidence; and I find that such charge was a false and malicious charge, and plaintiff's conduct therein wrongful and injurious to the defendant.

" (10) I find that the alleged settlement made between said plaintiff and defendant in October, 1897, whereby the plaintiff obtained from the defendant $200 in money, his (the defendant's) promissory note to the sum of $550, and a charge upon the firm books of $250 against said defendant, was induced, brought about, and obtained by the fraud and coercion of said plaintiff, and by duress, and therefore null and void.

" (11) I find as a fact that, at the time said Cram sold his one-half interest in the business of Bennett & Cram to said plaintiff, that, owing to losses in said business, for which said plaintiff was alone responsible, said half interest was not worth $3,400, but was only worth a much less sum,— a fact then known to said *Chester C. Bennett,* but then unknown to Cram and to said defendant *Luby.*

" (12) That after the purchase of Cram's interest by the plaintiff the plaintiff made and gave to said defendant a bill of sale, in writing, of Cram's half interest in said business.

" (13) I herewith submit to the court, in obedience to its orders, a statement of account between said parties plaintiff and defendant, of their partnership business, as far as I am able to do from their books and the evidence in said case, and make it a part of this report, and annex it hereto, marked 'A.'

"*Conclusions of Law.* (1) That the note given by defendant *Luby* to the plaintiff, or to said firm, for $550, was obtained by fraud and duress, and that said note should be surrendered to said defendant and canceled. (2) That the charge upon the books of said firm against the defendant of the sum of $250 on said alleged settlement was made under duress, and therefore should be canceled. (3) That the sum of $200 paid by said defendant when said alleged settlement was made was obtained by fraud and duress, and the same, with interest, to be refunded to said defendant by said plaintiff, and, if not so refunded, that said plaintiff, as receiver, pay to said defendant, from any money in his hands as such receiver, the sum of $400, with interest on $200 thereof from the time it was received by the plaintiff, to wit, October 20, 1897, to the time of its repayment. (4) That he is entitled to have and recover in this action for his costs and disbursements in defending said action, and that they be taxed against said plaintiff."

An account was filed with the findings, showing the finan-

cial condition of the firm of Bennett & Cram on January 4, 1897, also on March 24, 1897, and also the condition of the firm of Bennett & Luby in November, 1897, and at the time of the report. The report was confirmed by the court, and judgment was entered thereon to the effect that the defendant's note for $550 be canceled, and that the charge of $250 upon the books of the firm be canceled, and that the defendant recover of the plaintiff $200, being the sum obtained by duress, with interest from October 20, 1897, and that, in default of the payment of such sum by the plaintiff personally, the plaintiff, as receiver, pay to the defendant, out of the moneys in his hands as such receiver, the sum of $400, with interest on $200 from October 20, 1897, at six per cent.

From this judgment the plaintiff appeals.

For the appellant there was a brief by *Sutherland & Nolan*, and oral argument by *T. A. Nolan*.

For the respondent there was a brief by *Winans & Russell*, and oral argument by *John Winans*.

WINSLOW, J. The judgment in this case is certainly anomalous. The action was brought to dissolve a partnership, close up its business, settle the accounts, pay its debts, and divide the net proceeds. Both the complaint and the answer prayed for this relief. The judgment does not dissolve the partnership; does not settle the mutual accounts, nor even refer to them; does not dispose of the residue of firm assets in the hands of the receiver; and adjudges nothing except that the defendant is entitled to have an entry on the books canceled, and to receive back some money and a note which he gave the plaintiff under duress. How a judgment could be any less responsive to the pleadings, it is difficult to imagine. Yet the parties seem to have mutually agreed upon this method of disposing of the case. No errors are assigned or argued in this court, except errors in the findings of fact.

There is nothing that we know of to prevent parties from agreeing to the entry of an incomplete judgment, and where they have so agreed, and come to this court without exception or assignment of error which raises the question, we do not feel called upon to raise it ourselves, at least when it is not a question which in any way affects the jurisdiction. Proceeding, therefore, to the errors alleged in the findings of fact, as far as it seems necessary to discuss them, we shall take them up in their order.

1. It is substantially undisputed that the defendant purchased his one-half of the business relying on the inventory of March 24th, and upon *Bennett's* statement that he paid Cram $3,400 for Cram's share in the business.   The referee and the court found that the inventory of stock taken by Bennett & Cram January 3, 1897, was substantially a correct one; that between that date and March 24, 1897 (when defendant bought Cram's interest), there was an actual loss or shortage in the business of $1,432.10, which was known to the plaintiff, and for which he was responsible, but that the same was concealed from the defendant by the plaintiff by means of the fraudulent and mutilated inventory of March 24th, in which was inserted a large amount of property not actually in stock; that *Bennett* represented to defendant that he had paid Cram $3,400 for his one-half interest, when in fact he had only paid $3,000; and that said interest was worth a much less sum than $3,400, owing to losses for which the plaintiff was responsible, and which he knew, but which the defendant did not know.   All these findings are challenged as not sustained by the evidence, but it must be said, after perusal of the testimony, that there is considerable evidence, some of it quite persuasive in its character, in support of these various findings.   We do not see what good purpose would be subserved by detailing the evidence here, and dismiss the subject by saying that the findings appear to us to be sufficiently supported by evidence.

2. The court also found that the apparent loss suffered in the business between March 26 and November 8, 1897, was not a real loss, but was accounted for by the false and erroneous inventory of March 24, 1897, and that the charge made by the plaintiff that the defendant had surreptitiously taken goods or money to the amount of $2,000, or any other sum, was false and malicious. Examination of the testimony discloses ample evidence to support this finding, also. It is true, there is some evidence, mostly by the plaintiff himself, to support the charge; but there is not only direct, but circumstantial, evidence to the contrary. The evidence which sustains the finding that the inventory of March 24th was fraudulent and stuffed also indirectly supports this finding, for it is only by comparison with this inventory that the supposed loss or shortage appears.

3. This brings us to the finding that the settlement of October, 1897, by which the defendant gave his note for $550, made a charge against himself of $250 upon the firm books, and paid over to the firm in cash $200, was the result of duress and coercion. In this conclusion we cannot agree with the trial court. We have not been able to find legal duress on the most favorable construction of the evidence. The defendant was a young business man, in good health, nearly or quite twenty-three years of age, who had lived in this country more than six years and had been clerking in shoe stores more than five years. His parents lived in Ireland, but he had an aunt who was the mother superior at a convent in Janesville, besides a number of warm friends, one of whom (named Burns) was sufficiently interested in his welfare to indorse his note for $900 when he bought out Cram. His own story of the transaction is entirely insufficient to found a charge of legal duress upon. According to his own testimony, *Bennett* first charged him with crookedness in the business at the law office of Mr. Nolan, some two weeks before the settlement was finally made. *Bennett* and Messrs. Sutherland and Nolan were present. Nolan told

him of the charges *Bennett* had against him, of the disappearance of a gold pen from the store, of the fact that goods had been sold and not charged for, and that he (defendant) had collected money and not reported it, and that the business could not continue that way, and one or the other must sell or buy. .He insisted on staying until the matter could be investigated. Nolan left the office, and told defendant to talk to *Bennett.* He met *Bennett* next morning, and they agreed to talk the matter over on Sunday. They met on Sunday, and defendant told *Bennett* the charges were all false. *Bennett* said:

"'You have been careless. Nobody else has done so. All things seem to point to you.' He said: 'When you were clerk, those things didn't happen. Why do they happen now?' I told him lots of reasons I had for it. I told him just then something happened that afternoon or that forenoon, I think it was. He didn't say anything more about it. We decided to let it go until some day the following week. Then he kept up that way. He said we just have to have a settlement, and kept on telling me of this gold pen and these other things. He said, 'I have got evidence enough here to send you to state prison.' He says, 'You have got to make a settlement.' So I told him I was willing to make a settlement that was right; to do the square thing. I asked him what he thought a fair settlement would be, and have us continue in the business. He never said anything about my going out of the firm. Well, he said a thousand dollars would be right. I told him that was too much. I says, 'I have no means of getting that thousand dollars.' He says, 'What did you do with the money that you collected for these goods that you did not turn in the store?' I said I didn't collect anything that didn't go into the store. Then he suggested, when I didn't have the money, to make it up by giving a note. I told him that I had two hundred dollars out on interest, and gave him that over in cash. Then he suggested the note idea, and the charge on the books to my personal account, with the understanding that we should go along in business. He says, 'You are all right. All you have to do is to keep your head on your shoulders.' The note was to draw no interest. I asked him if he would hold it until all the obligations I had

were settled, on account of notes of Mr. Burns and Father Harlan and other parties. He said he would. He said: 'We won't let anybody know about this. It is all between the two of us, and we won't let it out.' The note was to be held pending the development of things during the year. It was my desire that we investigate. I wanted to satisfy *Mr. Bennett.* I thought it was the end of my business with the firm. I didn't want to get out. I wanted to stay until the end of the year. He said the last night he had evidence enough to send me to state prison. He made it very strong. He said: 'Do you know that I have enough evidence here to send you over the road?' He says: 'I am not to be trifled with, and I will push you through. You have got to come to time. You have got to get out or settle.'"

There is much other evidence by the defendant on the subject, but none of it is any stronger than that which is quoted. The note was not given until more than two weeks after the first conversation, and there was absolutely nothing to prevent the defendant from consulting his friends. He does not even claim that his will was overpowered, and it is plain that it was not, though he says that the threats influenced him. Under the well-established rules of law governing duress, the facts shown are insufficient to establish that defense here. *Rochester M. T. Works v. Weiss,* 108 Wis. 545, and cases cited.

We have met some difficulty at this point in determining whether the $550 note was given to the firm or to the plaintiff personally. If to the firm, then of course it should be reckoned as a part of the firm assets; but, if it was given to *Bennett* personally, then it cuts no figure in the settlement of the firm business. There is no finding on the subject. The note itself is not returned to this court with the record. The judgment recites that it has been returned to the court by the referee, and directs that it be canceled and returned to the defendant. Apparently this part of the judgment must have been complied with. The plaintiff says he wrote the body of the note himself, and the defendant says he signed it without reading it. The answer of defendant al-

leges that the note was given to the firm, and this is in some degree corroborated by the fact that the charge of $250 against the defendant on the books of the firm is necessarily a credit to the firm, and not to *Bennett* personally.    It is plain that it was not intended that one part of the $1,000 was to be paid to the firm, and one part to *Bennett* personally.    The only written evidence now before us which bears upon the question whether the settlement was made with the firm, or with *Bennett* personally, is the evidence of the entry on the books, and this conclusively shows that the money was to be paid to the firm.    The defendant refers in his testimony to the "$1,000 paid to the firm by me," and there is nothing in the plaintiff's testimony directly contradicting this theory, though the note is referred to by him as being given "to me."    On the whole evidence, and especially in consideration of the entry in the book, we have concluded that we must treat both the note and the charge on the book as assets of the firm, and not the individual property of the plaintiff.    So treating it, and holding that the evidence is insufficient to justify setting aside the transaction on the ground of duress, and holding, also, that *Bennett* must pay into the firm the shortage in the firm assets of $1,432.10 which was concealed in the inventory of March 24, 1897, we have the following as a correct statement of the firm assets, so far as the issues which have been tried and settled in this case are concerned:

| | |
|---|---:|
| Net assets of firm, as found by the referee, after sale of property and payment of debts by receiver | $493 61 |
| Note given by *Luby* to firm | 550 00 |
| Charge on books against *Luby* | 250 00 |
| Shortage in firm assets, for which *Bennett* must account | 1,432 10 |
| Total assets of firm | $2,725 71 |
| The share of each partner being one half, or $1,362.85, to make up this amount *Luby* must be charged with his note and the charge on the books | $800 00 |
| And is entitled to the balance | 562 85 |
| Total | $1,362 85 |

If the firm assets in the hands of *Bennett*, as receiver, or in the possession of the court, are not sufficient to pay to *Luby* the above sum of $562.85, the deficiency should be made a personal judgment against the plaintiff.

*By the Court.*— Judgment reversed, and action remanded with directions to render judgment as indicated in the opinion. No costs are to be allowed in favor of either party, except that appellant shall pay the fees of the clerk of the court.