PRICE, Respondent, vs. BANK OF POYNETTE and others, Appellants.

*November 17—December 6, 1910.*

*Duress: What constitutes: Threatening arrest of son: Sufficiency of evidence: Verdict: Construction and sufficiency.*

1. Duress, in its broad sense, now includes all instances where a condition of mind, caused by fear of personal injury or injury to one's property, wife, child, or husband, is produced by the wrongful conduct of another, rendering the person affected incompetent to contract with the exercise of his free will power, whether formerly relievable at law on the ground of duress or in equity on the ground of wrongful compulsion.

2. To constitute duress by threats they must be of such a nature and made under such circumstances as to constitute a reasonably adequate cause to control the will of the threatened person, and must have that effect, and the act sought to be avoided must have been performed by him while in such condition.

3. There is no legal standard of resistance which a party so circumstanced must exercise at his peril to protect himself, but the controlling element in each case is whether the means used, considering all the circumstances of the case, are such as to prevent the free exercise of the will power.

4. It is not necessary that threats of criminal prosecution, when these are the means used, should be made directly; if made to

a third person with intent that they be communicated, and they are so communicated, that is sufficient.

5. The evidence in this case is *held* to support the verdict to the effect that plaintiff was induced by threats of arrest and prosecution of his son for misappropriation of the funds of a bank in which the son had been employed, to sign a bill of sale of the property in question, and that such threats so affected his mental condition that he was incapable of the free exercise of his will power.

6. In answer to the first two questions of the special verdict the jury found that defendants made the alleged threat to induce the signing, and that plaintiff was induced thereby to sign; to the third question, "Did such threat so affect the plaintiff's mental condition that at the time he signed the bill of sale he was incapable of the free exercise of his will power?" they answered "Yes, partially." *Held*, that the last answer is not indefinite or uncertain; that, properly construed, it means that the threat so partially affected plaintiff's mental condition that he was incapable of the free exercise of his will power, but even if it means that he was *partially incapable* of such free exercise it is a sufficient finding of duress.

BARNES and MARSHALL, JJ., dissent.

APPEAL from a judgment of the circuit court for Columbia county: CHESTER A. FOWLER, Circuit Judge. *Affirmed.*

This action was brought to recover the value of certain personal property claimed to have been obtained from plaintiff, *James Price,* by defendants through fraud, duress, and without consideration.

The answer sets up misappropriation of money by plaintiff's son, Fred C. Price, while in the employ of defendants, and that on May 7, 1906, said Fred did turn over to defendants property in part payment, and that afterwards the full amount of the misappropriation was discovered and that the property in the bill of sale was turned over to defendants in part payment of such money; that all money paid defendants on account of the misappropriation was insufficient to pay it; that plaintiff had profited by Fred's misappropriation of the money of defendants. Defendants also deny generally the allegations of the complaint, and further allege that the certificate of deposit for $200 mentioned in the complaint was

the property of defendants. The following receipt was given by defendants showing the property received in reimbursement of money taken by Fred C. Price:

"Received of Fred C. Price the following certificates against the *Bank of Poynette:*

| | | |
|---|---:|---:|
| Number 5416, *James Price*, for..................... | $200 | 00 |
| Number 5231, Esther E. Price..................... | 50 | 00 |
| Number 4651, Esther E. Price..................... | 100 | 00 |
| Number 5659, J. J. Price, for..................... | 55 | 00 |
| Note against T. W. Cutsforth, for..................... | 34 | 50 |
| Note against Wm. Trout, for..................... | 31 | 00 |
| Four notes against James Insley, for..................... | 175 | 00 |
| Note against Thos. H. Tomlinson, for..................... | 90 | 00 |
| Note against George Cook, for..................... | 20 | 80 |
| Note against J. E. Foster, for..................... | 33 | 00 |
| Note against R. F. Buzzell, for..................... | 32 | 28 |
| Note against M. E. B. Thompson, for..................... | 105 | 00 |
| Note against George White, for..................... | 52 | 30 |
| Note against C. M. Theissen, for..................... | 300 | 00 |
| Books account against John Jamieson, for..................... | 335 | 00 |
| Books account against Frank Hadden, for..................... | 411 | 09 |
| Books account collected by G. L. Schwartz and proceeds turned in, for..................... | 54 | 72 |
| Note and mortgage given us by Ira C. Luce, for.......... | 2,000 | 00 |
| Horse, buggy, cutter, harness, etc., etc..................... | 200 | 00 |
| Warranty deed from *James Price* and wife.............. | 12,000 | 00 |
| Warranty deed from F. C. Price and wife and E. C. Price and wife..................... | 18,000 | 00 |
| Warranty deed from F. C. Price and wife, for homestead, house and lot..................... | 4,000 | 00 |
| Bill of sale of hardware stock..................... | 9,017 | 81 |
| Three certificates against the *Bank of Poynette*, notes and cash turned over Jan. 4, 1906..................... | 3,000 | 00 |
| Personal property from Minnesota farm, after deducting Price Brothers' overdraft..................... | 1,409 | 24 |
| Cash and sundry small items..................... | 150 | 85 |
| One note signed by *James Price*, Fred C. Price, Nell Price and others, for..................... | 6,000 | 00 |
| Making a total of..................... | $57,857 | 59 |

"Above amount being turned over to us by said Fred C. Price to reimburse us for the moneys taken from us and the *Bank of Poynette,* and discovered at this date, May 28, 1906. Said moneys having been fraudulently taken and misappropriated by said Price.

"JAMIESON BROTHERS and
"BANK OF POYNETTE,
"H. P. JAMIESON, Cashier."

The jury returned the following verdict:

"(1) Did the defendants or any of them, to induce the signing of the bill of sale, threaten to have the plaintiff's son prosecuted criminally unless the plaintiff signed the bill? *A.* Yes.

"(2) If to the above question you answer 'Yes,' then answer this question; if to the above question you answer 'No,' you need not answer this question: Was he induced by such threat to sign the bill of sale? *A.* Yes.

"(3) If you answer question No. 1 'Yes,' then answer this question; if you answer question No. 1 'No,' you need not answer this question: Did such threat so affect the plaintiff's mental condition that at the time he signed the bill of sale he was incapable of the free exercise of his will power? *A.* Yes, partially.

"(4) Was the plaintiff, at the time of the execution of the bill of sale, the owner of the two-hundred-dollar certificate of deposit described in the complaint? *A.* Yes.

"(5) Had the plaintiff, during all the time Fred Price was running the farm, been the owner of any of the cows described in the bill of sale? *A.* Yes.

"(6) If you answer 'Yes' to the questions above, then state the number of cows so owned and their value. *A.* Number, two. Value, seventy-five dollars.

"(7) What was the value of the wood included in the bill of sale? *A.* Ninety-six and seventy-five hundredths dollars.

"(8) Did the plaintiff, at the time the bill of sale was signed, own the rest of the personal property described in the bill of sale? *A.* Yes.

"(9) If to the above question you answer 'Yes,' then state the value of the rest of the property included in the bill of sale? *A.* Seven hundred and seventy-seven and seventy-four hundredths dollars ($777.74).

"(10) Did the consideration of twelve thousand dollars expressed in the deed of the plaintiff's farm and house and lot include the personal property situated on the farm? *A.* No."

Motions by defendants for nonsuit, directed verdict, to change answers to the questions in the special verdict, and for a new trial were denied, and judgment ordered for plaintiff

on the verdict.    Judgment was entered accordingly, from which this appeal was taken.

For the appellants there was a brief by *John A. Aylward* and *H. E. Andrews,* and oral argument by *Mr. Aylward.*

*Daniel H. Grady,* for the respondent.

KERWIN, J.    The defendants *H. P., A. J.,* and *J. C. Jamieson* were the owners of the defendant *Bank of Poynette* and also the owners of a large amount of other property at Poynette, Arlington, and in that vicinity.    Fred C. Price, a son of plaintiff, had been in the employ of defendants for several years prior to 1906 in the capacity of clerk, bookkeeper, and general utility man of the defendant bank.    Early in 1906 it was discovered that Fred C. Price had misappropriated a large amount of money belonging to the defendant bank. Fred admitted his guilt and turned over such property as he had to the defendants.    Other relatives of Fred also turned over property to defendants to help make up the shortage: At first the amount of the shortage was not known, but upon investigation it turned out to be $57,857.59.    Before the amount of the shortage was known and on February 16, 1906, the plaintiff and his wife made a deed of certain lands in the county of Columbia to defendant *A. J. Jamieson* to secure payment of the amount of shortage of their son, Fred C. Price, which might be discovered upon full investigation, and defendant *A. J. Jamieson* executed and delivered an agreement to the effect that upon payment in full to defendants of all sums misappropriated by Fred C. Price without loss or expense to defendants he would reconvey to plaintiff the described premises conveyed to him.    At this time it was not supposed that the amount of the shortage was as large as it was afterwards found to be.    After the full amount had been ascertained other relatives turned over other property to make up the amount.    Fred C. Price was not retained in the employ of defendants after January 4, 1906, and one Stroud,

who was then county judge, was employed by defendants in the matter. Defendants were cautioned by Stroud to make no threats or promises and to keep the matter of the defalcation as quiet as possible. On February 16, 1906, shortage to the amount of $30,000 had been discovered. An effort was made to obtain a bond in the sum of $50,000 from Mr. Wilson, father-in-law of Fred C. Price, which failed, whereupon the conditional deed before referred to was given by plaintiff and his wife. On the 16th day of February, 1906, a bill of sale of hardware stock in store was also executed by Fred C. Price and Albert Price and delivered to defendants in further satisfaction of the shortage, and the investigation of the books continued until the whole amount of shortage was ascertained and agreed upon May 7, 1906. On the 13th day of April, 1906, Fred C. Price and Charles E. Price and their wives conveyed certain farm lands in Minnesota to defendant *A. J. Jamieson* in further satisfaction of said shortage, the consideration named in said deed being $20,000, subject to a mortgage of $2,000. One Ira C. Luce, a brother-in-law of Fred C. Price, about the time of the execution of the bill of sale in question made a $2,000 mortgage to defendants in part satisfaction of the shortage. Other relatives of Fred contributed other amounts at or about the time of the execution of the bill of sale in question, the whole shortage having been made up except $6,000, and a note was drawn for this amount and signed by plaintiff with the understanding that it was to be signed by other relatives, which was done. It also appears from the receipt given by defendants that the entire shortage was made up by various contributions, including the $6,000 note, without the property described in the bill of sale in question. Point was made on the trial that the consideration of $12,000 mentioned in the receipt given for one of the farms turned over included the personal property in the bill of sale, but the jury negatived this in the tenth finding.

From the time of the discovery of the misappropriation

down to the time the bill of sale was executed the plaintiff and
his relatives were pressed to make up the amount, and there
is ample evidence that they were led to believe, by threats
made both directly and indirectly, that Fred would be prose-
cuted criminally if the shortage was not paid.   Threats were
made to relatives, knowledge of which was brought home to
the plaintiff, that if the amount was not paid Fred would be
"sent over the road," or words to that effect, and that if the
amount was paid or secured no arrest would be made.   There
can be no doubt but that the jury were entitled to find that
these threats terrorized the plaintiff.   The evidence shows
that the plaintiff and his family, previous to the discovery of
the misappropriation, had borne a good reputation in the
community, and plaintiff was solicitous about such reputation
and willing to do anything in his power to prevent the arrest
of his son Fred.   In February, 1906, plaintiff was called to
defendants' bank and informed of the embezzlement and in-
formed by the attorney of defendants that if he would give
the defendants a trust deed of his property there would be no
arrest, and plaintiff said he was willing to do what was right
to keep Fred out of prison, and would do whatever they said
was right, and that he could not do otherwise than leave it to
them to say what was right.   The evidence shows that shortly
before May 26, 1906, defendant *H. P. Jamieson* stated to
Ira C. Luce, brother-in-law of Fred C. Price, that the rela-
tives of Fred would have to come to the rescue, and Ira said
he did not feel as though he could, and defendant *Jamie-
son* said he would or he would put Fred over the road, and
that *Jamieson* also demanded of Albert Price that he turn
over the hardware stock, and that if he would not Fred would
go over the road, and that this was communicated to plaintiff
and his wife.

The evidence further tends to show that plaintiff was called
to the defendants' bank on or about May 23, 1906, and de-
mand made by defendants that he make an absolute deed of

the real estate which he had formerly conveyed to defendants as security, also that he sign the $6,000 note and bill of sale in question; that plaintiff made the absolute deed as required, but refused to sign the bill of sale in question, whereupon the prosecution of plaintiff's son Fred was threatened; that a deed of plaintiff's homestead was also required by defendants and their attorney; that plaintiff stated that if they took that they would take every dollar he had; that defendants' attorney at this time also spoke about arresting another of plaintiff's sons, who was then in Minnesota, for concealing stolen property; that defendants also required some firewood worth about $96 to be included in the bill of sale; that plaintiff then objected to signing the note or bill of sale, and one of the defendants then said that if he did not he would send Fred up or have him arrested. Plaintiff thereupon signed the bill of sale. He testified that he signed it to keep his son Fred out of prison, and that he signed it after defendants said they would send Fred to prison if he did not sign it.

Further recital of the evidence would seem unnecessary. It is ample to support the verdict to the effect that plaintiff was induced by threats to sign the bill of sale, and that such threats so affected the plaintiff's mental condition that at the time he signed the bill of sale he was incapable of the free exercise of his will power. The plaintiff at time of signing was seventy-four years of age, greatly distressed, and willing to do any thing possible, as the evidence tends to show, to save his son from arrest. This seems manifest from the fact that he turned over everything he had, including his little homestead and even his woodpile, when in fact, as appears from the defendants' receipt in evidence, the full amount of the shortage had been paid without the property covered by the bill of sale. But whether the articles covered by the bill of sale were necessary to complete the amount of the shortage or not is not material, since the evidence is ample to support the verdict that the bill of sale was executed by the plaintiff while

under duress.    What constitutes duress has been often consid-
ered and discussed by this court.    *Galusha v. Sherman,* 105
Wis. 263, 81 N. W. 495; *McCormick H. M. Co. v. Hamilton,*
73 Wis. 486, 41 N. W. 727; *Schultz v. Catlin,* 78 Wis. 611,
47 N. W. 946; *Mack v. Prang,* 104 Wis. 1, 79 N. W. 770;
*Wolff v. Bluhm,* 95 Wis. 257, 70 N. W. 73; *City Nat. Bank
v. Kusworm,* 91 Wis. 166, 64 N. W. 843; *Rochester M. T.
Works v. Weiss,* 108 Wis. 545, 84 N. W. 866; *Bennett v.
Luby,* 112 Wis. 118, 88 N. W. 37; *Batavian Bank v. North,*
114 Wis. 637, 645, 90 N. W. 1016; *Fred Rueping L. Co. v.
Watke,* 135 Wis. 616, 116 N. W. 174.    In defining duress in
*Galusha v. Sherman,* 105 Wis. 263, at pages 277 and 278
(81 N. W. 500), this court said:

"Duress, in its broad sense, now includes all instances
where a condition of mind of a person, caused by fear of per-
sonal injury or loss of limb, or injury to such person's prop-
erty, wife, child, or husband, is produced by the wrongful
conduct of another, rendering such person incompetent to con-
tract with the exercise of his free will power, whether for-
merly relievable at law on the ground of duress or in equity
on the ground of wrongful compulsion. . . . There is no legal
standard of resistance which a party so circumstanced must
exercise at his peril to protect himself.    The question in each
case is, Was the alleged injured person, by being put in fear
by the other party to the transaction for the purpose of ob-
taining an advantage over him, deprived of the free exercise
of his will power, and was such advantage thereby obtained?
If the proposition be determined in the affirmative, no mat-
ter what the nature of the threatened injury to such person,
or his property, or the person or liberty of his wife or child,
the advantage thereby obtained cannot be retained. · The idea
is that what constitutes duress is wholly a matter of law and
is simply the deprivation by one person of the will power of
another by putting such other in fear for the purpose of ob-
taining, by that means, some valuable advantage of him.
The means by which that condition of mind is produced are
matters of fact, and whether such condition was in fact pro-
duced is usually wholly matter of fact, though of course the

means may be so oppressive as to render the result an inference of law."

The controlling element in such cases seems to be whether the means used, considering all the circumstances of the case, are such as to prevent the free exercise of the will power. *Galusha v. Sherman, supra.* In *McCormick H. M. Co. v. Hamilton, supra,* there had been threats of criminal prosecution which it was claimed induced the signing of a mortgage. No physical restraint had been exercised, but the threat was of imprisonment of the son of the person induced to sign the mortgage, and it was held that such threats were sufficient to unduly influence and overpower the person signing the mortgage so that she did not act of her own free will and therefore did not sign away her homestead of her own free will, and that such acts should be declared void. Nor is it necessary that threats should be made directly. If they are made to a third person, with intent that they be communicated, and they are so communicated, that is sufficient. *Schultz v. Catlin,* 78 Wis. 611, 613, 47 N. W. 946.

*Mack v. Prang,* 104 Wis. 1, 79 N. W. 770, is quite in point. In that case there were threats to imprison Prang for embezzlement unless Mrs. Prang would give a mortgage. She at first refused, considered the matter for a day or two, and then executed the mortgage to prevent her husband from being sent to jail. The court said (pages 4 and 5): "Facts substantially similar to these have frequently been held to constitute duress which renders voidable a security or contract executed under their influence." See, also, *City Nat. Bank v. Kusworm,* 88 Wis. 188, 59 N. W. 564. It is true that in order to constitute duress "the threat must be of such a nature, and made under such circumstances, as to constitute a reasonably adequate cause to control the will of the threatened person, and must have that effect, and the act sought to be avoided must be performed by such person while in such condition." The following cases are mainly relied upon by appellant:

*Wolff v. Bluhm,* 95 Wis. 257, 70 N. W. 73; *Fred Rueping L. Co. v. Watke,* 135 Wis. 616, 116 N. W. 174; *Bennett v. Luby,* 112 Wis. 118, 88 N. W. 37; *Rochester M. T. Works v. Weiss,* 108 Wis. 545, 84 N. W. 866; *City Nat. Bank v. Kusworm,* 91 Wis. 166, 64 N. W. 843; and *Galusha v. Sherman,* 105 Wis. 263, 81 N. W. 495. But we think the conclusion we have reached in the instant case, in view of the evidence, is not out of harmony with the cases relied upon by appellant.

On the point of the right to recover for the $200 certificate of deposit, the court is of opinion that there is ample evidence to support the answer of the jury to the fourth question of the special verdict to the effect that the plaintiff was the owner of said certificate.

It is further argued by counsel for appellant that the answer to the third question of the special verdict is uncertain, defective, and meaningless, hence there should be a new trial. By the answers to the first and second questions of the special verdict the jury found unequivocally that the defendants, or some of them, to induce the signing, threatened the plaintiff, and that plaintiff was induced by such threat to sign the bill of sale. To the third question, "Did such threat so affect the plaintiff's mental condition that at the time he signed the bill of sale he was incapable of the free exercise of his will power?" the jury answered "Yes, partially." The question arises as to the proper construction of this answer, or what did the jury mean by it when considered in connection with questions 1 and 2 of the verdict. The jury by their answers to the first and second questions had found that defendants made the threat to induce the signing, and that the plaintiff was induced by the threat to sign. These questions standing alone would seem to negative the idea of the free exercise of the will power by plaintiff in signing the bill of sale. But we are met with the answer to the third question, and it is said by appellants' counsel that this is a decisive question and is meaningless and therefore the verdict cannot stand. And it

is argued that the word "partially" in the verdict qualifies the phrase "free exercise of his will power" and not the phrase "plaintiff's mental condition." Even if the word "partially" qualifies as argued by appellants, still it would seem difficult to adopt the conclusion contended for. How plaintiff could be in the free exercise of his will power when the threats rendered him partially incapable of the free exercise of his will power is not easy to see. There would seem to be no middle ground in the free exercise of one's will power. One is in the free exercise of his will power or he is not, and one cannot make a valid contract when he is partially incapable of the free exercise of his will power. He must be in possession of his faculties and able to use them. Free exercise of the will power must mean without restraint. In *First Nat. Bank v. Sargeant,* 65 Neb. 601, 91 N. W. 597, 59 L. R. A. 299, the court approved the following definition of duress: "Duress may be defined as an unlawful restraint, intimidation, or compulsion of another to such an extent and degree as to induce such other person to do or perform some act which he is not legally bound to do, contrary to his will and inclination," and said: "It is obvious that, if the act is done contrary to the will and inclination of the injured party, it cannot be the exercise of his free will. His will is subjected to that of another, and he is compelled to yield and submit to an illegal exaction because of the dominant power." *Shaw v. Gilbert,* 111 Wis. 165, 86 N. W. 188; *Baker v. Morton,* 12 Wall. 150; *Parmentier v. Pater,* 13 Oreg. 121, 9 Pac. 59; *Mack v. Prang,* 104 Wis. 1, 79 N. W. 770; *Wolff v. Bluhm,* 95 Wis. 257, 70 N. W. 73; *Galusha v. Sherman,* 105 Wis. 263, 81 N. W. 495; *Lee v. Burnham,* 82 Wis. 209, 52 N. W. 255. But the court is of opinion that the proper construction of the answer is that the threat so partially affected the mental condition of the plaintiff as to render him incapable of the free exercise of his will power. This appears to be the logical meaning of the answer, and the one which the jury intended in view of their

answers to questions 1 and 2 and the circumstances of the case. The free exercise of the will power depends upon the mental condition, and the threat affects the mental condition, and the mental condition controls the exercise of the will power. So we think the answer means that the threat so partially affected the mental condition of the plaintiff that at the time he signed the bill of sale he was incapable of the free exercise of his will power.

Error is assigned upon rulings on evidence, and also upon remarks of the judge upon the trial. It is sufficient to say that we find no error in these respects. We desire to say in passing that no opinion is expressed on the sufficiency of the evidence as to the validity of any instrument executed by the plaintiff in the transaction in question, except the bill of sale.

We find no reversible error in the record, therefore the judgment of the court below must be affirmed.

*By the Court.*—The judgment is affirmed.

BARNES, J. (*dissenting*). The evidence to show duress was slight, but was perhaps sufficient to carry the case to the jury. Accepting the verdict as a verity, it, in connection with the uncontradicted evidence in the case, shows that the parties to this action were *particeps criminis* in compounding a felony. This being so, the law should leave them where it found them, and refuse to afford relief by restoring to one of them the property which he parted with as a consideration for the unlawful promise exacted.

Furthermore, I think that a finding that the plaintiff was *partially* incapable of exercising his free will when he signed the bill of sale by reason of the threats made, negatives the idea that he signed the same under legal duress. As I understand the rule, the threats must produce such a condition of mind as to destroy the free agency of the person threatened, in order to constitute duress. *Batavian Bank v. North,* 114 Wis. 637, 90 N. W. 1016; *Galusha v. Sherman,* 105 Wis. 263,

81 N. W. 495; *Wolff v. Bluhm,* 95 Wis. 257, 70 N. W. 73. It seems to me that the finding falls short of establishing as a fact that the threat was the controlling cause that induced the plaintiff to execute the instrument.

MARSHALL, J. I concur in the dissenting opinion by Mr. Justice BARNES.