## O'TOOLE *v.* LAMSON.

DURESS; PARENT AND CHILD; PROMISSORY NOTE; DEEDS OF TRUST; EVIDENCE; RATIFICATION; LACHES.

1. Duress is a condition of mind resulting from such improper pressure that the will is overcome and an involuntary act or contract induced,—a condition of mind produced by an unlawful intimidation, and resulting in the doing of an act which is not required by law.

2. A note and mortgage executed by the mother of a partner, to indemnify the firm against "irregularities" on the part of the son, are voidable for duress, where their execution was induced by representations by the other partners that the son had not accounted for or properly applied certain funds in his hands, and that they must take immediate steps to protect themselves against loss, having been intended to create and having created on her part the belief that criminal proceedings would be instituted unless she came to her son's aid.

3. A note and mortgage are not less voidable for duress than an earlier note for which they were substituted, merely because they were executed without further persuasion on the day following the representations which induced the immediate execution of the first note, conditions not having changed in the meantime.

4. The transferee of a note and mortgage procured by the payee by duress must, in order to enforce the same, show that he took it in good faith, for value, and without notice of the infirmity. (Citing D. C. Code, §§ 1356 and 1353, 31 Stat. at L. 1401, chap. 854.)

5. The transferee of a note and mortgage executed under duress, to a partnership, by the mother of a partner who had misapplied funds, will not be deemed a holder in due course, where they were transferred to him through a broker whose office was at the time in charge of one of the other partners, and where the testimony of such other partners, together with that of the broker and the transferee, though intended to indicate that the mother told the transferee, in response to questions before the transfer, that she executed the note and

mortgage "to assist the company in its business," shows contradictions, inconsistencies, and a concert of action between them; and the mother testifies that she answered the inquiries by stating that she gave the note and mortgage to protect her son, and is corroborated by her daughter and also by the facts and circumstances.

6. A note and mortgage obtained by duress are not ratified by making part payment while the conditions which induced their execution remain unchanged.

7. Laches cannot be predicated of the failure of the maker of a promissory note to take further action after the repudiation of the note for duress, and before its enforcement was attempted.

No. 2568.    Submitted November 7, 1913.    Decided January 5, 1914.

HEARING on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia dismissing a bill in equity to enjoin the sale of real estate under a deed of trust, and to cancel the promissory note secured thereby.

*Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal by the complainants below, Catherine R. O'Toole, and Illinois Surety Company, her surety, from a decree in the supreme court of the District dissolving a *pendente lite* injunction, dismissing complainants' bill, and awarding damages, costs, and counsel fees.

The bill was filed to restrain an advertised sale of premises, 1115 Fourteenth street, N. W., in this city, under a deed of trust executed by the complainant, and to require to be delivered up for cancelation the note for which the trust deed was given as security.  The theory of the bill is that this note and deed of trust were obtained through duress exercised by and on behalf of the defendants Anderson and Murray.  The defendants Dyer and Hall are the trustees named in said deed, and the defendant Weschler the auctioneer.  Lamson was named as the apparent owner of the note when the complaint was filed.  It developing that the defendant Faris claimed to be the holder of the note, he was made a party.  A hearing was had on the question

whether an injunction *pendente lite* should issue, and at this
hearing testimony of witnesses was taken orally on behalf of
the respective parties, and the result of the hearing was the
issuance of the temporary injunction. Thereupon further tes-
timony was taken, and, upon final hearing before another judge,
the above final decree was entered, and this appeal taken.

About three months prior to the transactions resulting in this
litigation, the so-called "Southern Automobile Sales Company,"
a copartnership composed of the defendants Anderson and Mur-
ray and the son of one of the complainants, James J. O'Toole,
was formed in this city. Through O'Toole a contract was
negotiated with the Rider-Lewis Automobile Company, of An-
derson, Indiana, under which the sales company was to handle
the Rider-Lewis automobiles in a given territory. A deposit of
$3,000 was required by the Rider-Lewis Company on account of
this contract. O'Toole was to be the traveling representative
of the sales company and he traveled extensively in the terri-
tory assigned his company, his expenses, of course, being met
by the copartnership. On November 6, 1909, while O'Toole
was absent, presumably on business of his company, a letter was
received by the sales company from the Rider-Lewis Company
requiring the balance of $1,500 on the $3,000 deposit to be paid.
Anderson and Murray appear to have been surprised at this
requirement, because, as they assert, $3,000 had been raised by
the copartnership and placed in O'Toole's hands to make the
deposit. It is claimed that Anderson and Murray at that time
were in possession of information leading them to believe that
there were other "discrepancies" in O'Toole's accounts.

On November 9th Anderson and Murray, by telegraphing the
Rider-Lewis Company, definitely learned that 1,500 only had
been deposited on the sales company's contract by O'Toole.
Whereupon, on November 10th, 1909, they consulted Mr. How-
ard Boyd, an attorney who had *previously* acted for the firm.
At this time O'Toole was still absent. As the result of the inter-
view between Anderson, Murray, and Boyd, the three men, on
the afternoon of the same day, went to the store kept by the com-
plainant, Mrs. O'Toole, and asked to see her alone. According

to her testimony, they then announced that they had come to tell her that her son had embezzled and forged, and that they must have $3,000. She told them that she did not have that much money, whereupon "they said they had to have it before the sun went down, or else they would have her son arrested and brought home in chains, is the way she understood them; she begged them not to do that, and to wait a little while, as she was selling the house and would give them the money in cash; they would not wait, and said they had to have it that evening, before the sun went down." She again informed them that she had no money, whereupon they offered to take a second mortgage in the sum of $3,000 on the house she lived in. She was so worried that she signed the paper which they then presented to her. Mr. Murray and Mr. Boyd came the next day with another paper, "saying it would make it more legal." The first paper she signed was an ordinary promissory note, payable to the order of the sales company. On the next day she signed a like sixty-day note and the deed of trust to secure same, the first note being surrendered. Mrs. O'Toole's sister, Mrs. McArdle, was at the store upon the occasion in question, and, her attention being arrested, she went back "to see what the trouble was, and Mrs. O'Toole told her in front of these three men that they said James had embezzled and forged;" that the men had said they would bring James back in chains if they did not get the money that evening.

Mr. Boyd, testifying for the defendants, stated that he had known defendant Anderson for a number of years, and that he *represented Anderson and Murray* as members of the sales company "in connection with a deal with Mrs. O'Toole," meaning the transaction here involved. Witness admitted that the three men together went to Mrs. O'Toole's store, as she stated, and asked to speak to her alone; that it was finally explained to her that Anderson and Murray were desirous of locating her son, "for the reason that they had some correspondence, which had just recently been received from the Rider-Lewis Company, to the effect that Mr. James J. O'Toole had deposited only $1,500 with the Rider-Lewis Company on behalf of the South-

ern Automobile Sales Company, whereas under the agreement between Mr. O'Toole and the Southern Automobile Sales Company he should have deposited $3,000 with the Rider-Lewis Company, as that sum, $3,000, had been delivered to Mr. O'Toole to deposit with the Rider-Lewis Company, and he had given Mr. Anderson and Mr. Murray to understand that he had deposited $3,000 with that company." Witness further stated that Mrs. O'Toole was informed that the contract with the Rider-Lewis Company was regarded as of value, and that unless the additional $1,500 was deposited they feared the $1,500 already deposited would be lost to the company. The correspondence with the Rider-Lewis Company was then exhibited to Mrs. O'Toole. The $3,000 check which had been given her son, and upon which his indorsement appeared, was also shown. Other letters and papers were exhibited, tending to show that her son had received other moneys for which he up to that time had not accounted. Mr. Boyd further testified that after Mrs. O'Toole had been shown these papers "she asked the question voluntarily, what could be done in order to protect the interests of all concerned." Mr. Boyd then asked her, according to his testimony, "whether or not she would be willing to furnish sufficient finances in order to tide over this difficulty; and my recollection is that before she answered she retired from our presence and talked with her sister;" that something was said about selling a piece of real estate in the near future, when she would have some cash; that it was then explained to her "that something would have to be done in the near future in order to preserve that $1,500 and the contract, and then the matter was mentioned of her raising the money on her note secured by mortgage." Later on in his testimony the witness says that Mrs. O'Toole "consented to give a mortgage;" that when her sister came in and said something "that indicated that someone was making a charge of wrongdoing against James J. O'Toole" the witness said: "Now, don't misunderstand us; we are not making any charge against Mr. James J. O'Toole; we have no information concerning any irregularity, if he is guilty of any, *except what is contained in this correspondence I have shown*

*here."* The witness was then asked by counsel for the defendants what amount was fixed upon, and replied: "The conversation I have related all took place before there was anything said about what appeared to be his shortage, and I may add that other correspondence was exhibited there to which I have not referred particularly, and which indicated that Mr. O'Toole had collected moneys belonging to the Southern Automobile Sales Company, which he had not accounted for, and which had been in his possession a length of time sufficient to enable him to have accounted for it.  *  *  *  After Mrs. O'Toole said she would give a mortgage *to indemnify the company against any loss that might happen by reason of any irregularities on the part of her son,* if there were any, then Messrs. Murray and Anderson talked about the different transactions, based entirely on the correspondence which was there, and talked in the presence of Mrs. O'Toole, and added up and ascertained what it would all amount to approximately, and Mrs. O'Toole stood there and heard that conversation.  They figured that it would amount to about $3,000, simply from the correspondence." In cross-examination the witness stated that Mrs. O'Toole was seen because "they had the impression that it was all important to fix this matter up with the Rider-Lewis Company.  It was not with the idea of getting money from Mrs. O'Toole that they went to see her, but merely to consult her as to what could be done to protect the interests of the Southern Automobile Sales Company.  *  *  *  The reason for going to see Mrs. O'Toole was to consult her in regard to her son and her son's business.  *  *  *  There appeared to be, at the time of that interview, *a shortage of Mr. O'Toole's account amounting to about $3,000, from the correspondence* which Mr. Murray and Mr. Anderson had in their possession; the only pressing emergency was about the $1,500; Mrs. O'Toole said she was perfectly willing *to indemnify* the other members of the concern *against any irregularities her son might be guilty of,* and then the amount was figured from the correspondence."

The testimony of Mr. Anderson and Mr. Murray does not differ materially from that of Mr. Boyd.  It is worthy of

note, however, that Mr. Murray, in his direct examination, testifies that Mrs. O'Toole's sister "seemed to be quite excited" upon the occasion in question, while Mr. Anderson testifies that "just before they were leaving, Mrs. O'Toole's sister, Mrs. McArdlë, became hysterical; she seemed rather friendly to Mr. Boyd and Mr. Murray, but wanted to accuse witness of desiring to bring Jimmie back in irons." The witness was then asked by counsel for the defendants whether he made any charge of criminal conduct on the part of young O'Toole, and answered: "We simply showed the papers we had, which Mrs. O'Toole read."

Portions of the sworn joint and several answer of Anderson and Murray will here be pertinent. In that answer they say that the purpose of the said interview with Mrs. O'Toole was to obtain her assistance in getting her son back to Washington, "to put an end to his representation of the said partnership and of these defendants as members of it, and also to ascertain whether *any arrangement could be made through her to secure them on account of the aforesaid sum retained by him and not accounted for.* \* \* \* They simply called her attention to the correspondence which they had had and the information they had received, *and stated to her that it would be imperatively necessary for them to take some action at once to protect themselves against loss,* not being clear in their minds as to just what action they could take. After a full discussion of the entire situation, Mr. Boyd suggested to plaintiff that her son might have some friends that would assist in making good the amount due from him."

Having secured the note and deed of trust, Anderson, who testified that at that time he or the sales company was running the office of the defendant Lamson, a note broker, asked Lamson if he could negotiate the note, and arranged with him to do so. Lamson testified that this occurred sometime between November 18th and 24th, 1909; that, as he did not know the maker of the note, he called Mrs. O'Toole on the telephone, and asked her if the signature on the note was genuine and all right, and that she said it was. Lamson further testified that he then went

up to see Mrs. O'Toole, "and made inquiry about her capacity to pay the note at maturity." The witness said he was then negotiating with Mr. Faris, with whom he had had considerable talk over the telephone; that witness and Mr. Murray interviewed Mr. Faris. The result of the interview was that Mr. Faris and Mr. Lamson went to see Mrs. O'Toole "to look over the building," and they also had a conversation with her. According to the testimony of Mr. Lamson, Mr. Faris asked her if the note would be paid at maturity. She said it would, and that possibly she would want to pay it within a few days, or pay part of it within a few days; that the note was all right; that Mrs. O'Toole made a payment of $1,500 within three or four days. It developed in his cross-examination that the note bears an indorsement, "Interest paid to March 11th, 1910," the indorsement being in the handwriting of Mr. Faris; that this interest was not paid by Mrs. O'Toole, but by Lamson, with money said to have been furnished by Anderson. Lamson testified that he did not tell Faris who paid it. The witness was unable to explain why Anderson "was paying interest on the note." He further was unable to give any reason why he did not call Mr. Faris's attention to the fact that this interest was being paid by Anderson, instead of by the maker of the note.

In the answer of Anderson and Murray they state that, shortly after receiving the note from Mrs. O'Toole, they "placed it in the hands of defendant Lamson to be negotiated." In Mr. Lamson's sworn answer he states that Mr. Anderson informed him "that he took a note of Catherine R. O'Toole for $3,000, which he desired him (Lamson) to negotiate;" that affiant did thereafter negotiate the note to Mr. Faris; that, on or about the maturity of the note, affiant was informed, by counsel for Mrs. O'Toole, of her contention that the note "had been procured from her by fraud or misrepresentation."

Mr. Faris, an attorney at law, testified that Lamson offered to sell the note to him, and that "the result of the conversation was that he should examine into the note, and, with that

in view, Lamson asked him over to Mrs. O'Toole's store and introduced him to her;" that she said the note was all right; "that she had given it to assist the company in its business; that her son was interested in the company, and was connected with it; during the conversation, or it may have been when Mr. Murray was present, it was developed that her son was not here." The witness further said that he desired to meet Mrs. O'Toole with some member of the company, as he "wanted to know in regard to this business transaction between her and this company, whether it was satisfactory to her, and if the note was all right. She said it was; and it was on this occasion she told me her son was away from home." The witness denied that Mrs. O'Toole had informed him that she signed the note to protect her son; that if she had so stated it would have aroused his suspicions. Witness being asked to explain an apparent conflict between his testimony at the preliminary hearing concerning the manner of his payment for this note, and his testimony at the final hearing, said, *inter alia:* "At the time of the examination before Justice Gould, which was fourteen months after this transaction, I was called as a witness for the plaintiff; I had not had any notice that I would be called as a witness, had not refreshed my recollection with any of the details of the transaction." It will not be necessary, however, to pursue this point further.

Mrs. O'Toole, testifying concerning the different interviews she had with Lamson and Faris, said that Mr. Faris asked her whether she had signed the note in suit, and she replied "Yes;" that Mr. Faris then said: "Do you know why you signed it?" and she replied that "it was to protect her son, who was away. * * * I signed to protect my son, who was out of town;" that Faris then asked her if her son knew she had signed it, and she replied in the negative; that the $1,500 payment was made before she had seen or heard from her son. Mrs. O'Toole was certain that she did not say that she signed the note to protect the business of the sales company. She further testified that her son had paid her back the $1,500 which she had paid on the note; that he had given her money in

addition to this, but that was in accordance with his custom of helping to support her, and not on account of this note. Miss Anna O'Toole, a daughter of the complainant, testified that she was present upon one of the occasions when Mr. Faris asked her mother if she had signed the note, and heard her mother say that she signed it to protect her son, who was out of the city and knew nothing about it. Young O'Toole testified that when he returned home, and found that his mother had given this note, and had paid $1,500 on account of it, he reimbursed her to the extent of her payment; that he gave her nothing in addition "on account of this $3,000 transaction;" and that any other money he gave his mother "was for the support of his home."

*Mr. Wilton J. Lambert, Mr. Rudolph H. Yeatman,* and *Mr. D. W. Baker* for the appellants.

*Mr. Andrew Wilson* for the appellees.

Mr. Justice ROBB delivered the opinion of the Court:

Duress may be defined as a condition of mind resulting from such improper pressure that the will is overcome and an involuntary act or contract induced,—a condition of mind produced by an unlawful intimidation, and which results in the doing of an act which is not required by law. "When one is under the influence of extreme terror, or of threats, or of apprehension short of duress, his act may be avoided, for in cases of this sort he has no free will, but stands *in vinculis.*" 1 Story, Eq. Jur. 239. "A condition which exists where one, by the unlawful act of another, is induced to make a contract, or perform or forego some act, under circumstances which deprive him of the exercise of free will." 14 Cyc. 1123. And the rule is well settled that either a husband or wife may avoid a contract if it was made to relieve the other from duress. Shep. Touch. 61; *Robinson* v. *Gould,* 11 Cush. 55. And this rule has been extended to the relation of parent and child. Thus in

*Harris* v. *Carmody,* 131 Mass. 51, 41 Am. Rep. 188, it was held that a father may avoid a mortgage which he has been induced to sign by fears of the prosecution and imprisonment of his son. The court said: "No more powerful and constraining force can be brought to bear upon a man to overcome his will and extort from him an obligation than threats of great injury to his child." In *Meech* v. *Lee,* 82 Mich. 274, 46 N. W. 383, a mother had executed a mortgage under a belief, induced by the mortgagee, that she would thereby save her son from a threatened criminal prosecution. The mortgage was set aside, not only as being the result of duress, but as being voidable as against public policy. *McCormick Harvesting Mach. Co.* v. *Hamilton,* 73 Wis. 486, 41 N. W. 727, was a case where a mortgage was set aside that had been executed by a wife under duress and undue influence by means of fears that unless she did so the imprisonment of her son would result. The court, after reviewing the authorities, said: "The contract is then void by every principle of equity. It is the worst species of fraud, because it attacks the weakest point of human nature, and appeals to natural affection." In *Williamson, H. F. Co.* v. *Ackerman,* 77 Kan. 502, 20 L.R.A.(N.S.) 484, 94 Pac. 807, the court held it to be a good defense to a mortgage executed by a father, that his son would be arrested and prosecuted, the court saying: "The suit was not one to determine the guilt or innocence of John [the son], nor was the matter of his actual guilt an essential feature of the defense of duress. The point for decision was whether the threats of arrest and prosecution of John put the father in fear, and thus overcame his will and rendered him incompetent to contract.  *  *  *  The conduct of John, whatever it may have been, was no excuse or justification for intimidating and coercing the father to pay John's debt, or to give a mortgage on his home to secure the payment of such debt." In *Fisher* v. *Bishop,* 108 N. Y. 25, 2 Am. St. Rep. 357, 15 N. E. 331, a father made certain transfers of his property for the benefit of creditors of his son, and through one occupying a fiduciary relation to the father. The transfers were set aside. In its opinion the court said: "The

case shows that by these means the defendants have obtained security for a large amount from an old man who was under no legal or moral obligation to give it, and without any consideration to support it except the nominal one of a dollar, and that this was extorted at a time when he was laboring under much distress and anxiety of mind on account of the trouble that encompassed him." *Bayley* v. *Williams,* 4 Giff. 638, was a case where a note and security had been given by a father to protect his son from criminal prosecution for forgery of his father's name to promissory notes. The court said: "If the fair result of the evidence shows that the agreements were executed under influence felt by the plaintiff, and exercised by the defendants, if the fear of the criminal prosecution against the plaintiff's son, or if the result of the discovery of the criminal act, for which the plaintiff was not liable, was used by the defendants against the plaintiff, to operate upon his fears so as to induce him to give a security which would relieve his son from a criminal prosecution, according to the law of this court a security obtained under such circumstances cannot stand. The inequality of the situation of the parties, the one exacting a security which the other is driven to give in order to save his son from exposure, disgrace, and ruin, taints the security obtained under the influence of such fears." This case was sustained on appeal to the House of Lords (L. R. 1 H. L. 200).

A brief analysis of the evidence in the present case bearing upon the question of duress will suffice. According to the admissions of the defendants Messrs. Anderson and Murray, and of Mr. Boyd, who accompanied them upon the occasion of their interview with Mrs. O'Toole which resulted in the giving of the first note by her, the situation had been carefully reviewed by the three men prior to the interview, and the conclusion reached that young O'Toole had not acted in good faith toward his partners; that he had deposited with the Rider-Lewis Company $1,500, when he should have deposited $3,000. The papers tending to prove this alleged delinquency on his part were given Boyd, admittedly for the purpose of showing them to Mrs. O'Toole. That other papers were placed in Boyd's hands for

a like purpose appears from the testimony of these three men. Mr. Boyd says: "I may add that other correspondence was exhibited there (at the first interview) to which I have not referred particularly, and which indicated that Mr. O'Toole had collected moneys belonging to the Southern Automobile Sales Company, which he had not accounted for, and which had been in his possession a length of time sufficient to enable him to have accounted for it." He further testifies that after Mrs. O'Toole had consented to "give a mortgage to indemnify the company against any loss that might happen *by reason of any irregularities* on the part of her son," the amount of these alleged irregularities was ascertained "to be about $3,000, simply from the correspondence." Again, in his cross-examination, he says: "She was perfectly willing to *indemnify the other members of the concern against any irregularities* her son might be guilty of." Moreover, in the answer of Anderson and Murray to which we have alluded, they stated under oath that one purpose of their interview with Mrs. O'Toole was "through her to secure them on account of the aforesaid sum retained by him" (the son), and that they "stated to her that it would be imperatively necessary for them *to take some action at once to protect themselves against loss.*"

The conclusion is irresistible, from the evidence before us, that these three men, when they sought this interview with this mother, intended to convey to her, and did in fact convey to her, the impression that her son, who was then hundreds of miles away, had been guilty of such serious "irregularities" as would place him in jeopardy, and that they were prepared to take steps against him unless his "irregularities" should be made good immediately. They of course knew that she was ignorant of the law, ignorant of the rights of one partner as against another, but, like all mothers, imbued with a love for her son and a consuming desire to protect him at any cost. The precise words or terms employed, therefore, are of little importance. The question is, What impression did they intend to convey and what impression was conveyed to her mind? Under the evidence, can it be doubted for a moment that the

result of the interview caused her to believe that, unless she came to the rescue, these men would proceed against her son and place him in jeopardy. She testifies, and her testimony is corroborated by her sister, that these men told her in terms that her son had "embezzled and forged," and that unless they had the money before the sun went down "they would have her son arrested and brought home in chains." It will be remembered that Murray, in his direct examination, stated that Mrs. O'Toole's sister upon this occasion "seemed to be quite excited," while Anderson testified that she "became hysterical." It is very singular, if the interview was as peaceful, harmonious, and free from restraint as the defendants would have us believe, that the sister should have become excited and hysterical. But a still more significant inconsistency in the testimony is apparent. Mr. Boyd, at one point in his testimony, states that "it was not with the idea of getting money from Mrs. O'Toole that they went to see her, but merely to consult her as to what could be done to protect the interests of the Southern Automobile Sales Company;" that the "only pressing emergency was about the $1,500." In other words, that it was necessary to obtain $1,500 immediately to preserve the contract with the Rider-Lewis Company. And yet a note for $3,000 was obtained from Mrs. O'Toole, and upon exactly the same representations that were made to obtain the $1,500. This, we think, shows very clearly the motive that really actuated the three men when they sought this interview with Mrs. O'Toole. We think it too clear for argument that they intended to induce her, through fear that her son would otherwise be proceeded against and placed in jeopardy, to sign a note for $3,000 without the slightest consideration.

Something was said during the hearing at bar to the effect that, even conceding that the signing of the first note was occasioned by duress, the note and mortgage in suit were voluntarily executed. This contention is obviously untenable. Conditions had not changed on the next day, when the signature of Mrs. O'Toole was obtained to these instruments. As Justice Story says: "If the party is still acting under the pressure

of the original transaction, or the original necessity, or if he is still under the influence of the original transaction, and of the delusive opinion that it is valid and binding upon him, then, and under such circumstances, courts of equity will hold him not barred from relief by any such confirmation." 1 Story, Eq. Jur. 345. See also *Meech* v. *Lee,* 82 Mich. 275, 46 N. W. 383.

The question whether the defendant Faris is a holder in due course must now be determined. We have ruled that this note was obtained through duress, hence the burden was on Mr. Faris "to prove that he or some person under whom he claims acquired the title as a holder in due course." D. C. Code sec. 1363 [31 Stat. at L. 1402, chap. 854] ; *Lytle* v. *Lansing,* 147 U. S. 59, 62, 37 L. ed. 78, 79, 13 Sup. Ct. Rep. 254. In other words, the burden was on Mr. Faris to prove that he took the note in good faith, for value, and without notice of any infirmity in the instrument. D. C. Code, sec. 1356.

It will be remembered that Mr. Anderson, who interested the note broker, Mr. Lamson, in this note, testified that he was "running the office for Mr. Lamson at the time,—at least the company was ;" that he, Anderson, made arrangements with Lamson to negotiate the note. The relations of Mr. Lamson and Mr. Anderson, therefore, were such that any information possessed by Anderson concerning the circumstances surrounding the execution of this note would naturally have been imparted to Lamson. Mr. Faris had already purchased several notes through Mr. Lamson, and it is apparent from their testimony that they were well acquainted. That they deemed it necessary to interview Mrs. O'Toole is clear. Mr. Faris states that Mrs. O'Toole during that interview said she had given the note "to assist the company in its business ;" that he, Faris, "wanted to know in regard to this business transaction between her and this company, whether it was satisfactory to her, and if the note was all right. She said it was ; and it was on this occasion that she told me that her son was away from home." Lamson, according to his testimony, merely asked her if her signature was genuine "and if it (the note) was all right." Mr.

Faris admits that, if Mrs. O'Toole had informed him that she had given the note to protect her son, such a statement would instantly have excited his concern, and he "would not have had anything to do with it." Attention already has been directed to a conflict between the testimony of Mr. Faris at the preliminary and final hearings as to his payment for the note. While Murray appears to have taken an active part in negotiating the note, he testified that he did not know who bought it, that is, whether Lamson or Faris. Anderson, however, was very certain that Lamson purchased it for $2,800, and Lamson in his testimony said he purchased it for that sum, and sold it to Faris for $2,900. In his sworn answer Lamson stated that he negotiated this note to Faris for Anderson. According to Mr. Faris's testimony he received no information that Mrs. O'Toole did not intend to pay the balance on this note until about a year after it was given; and yet in his sworn answer Mr. Lamson states that, on or about the maturity of the note, counsel for Mrs. O'Toole informed him that it had been "procured from her by fraud or misrepresentation;" that Mrs. O'Toole, at about the same time, "informed respondent that she was willing to pay $500 on the aforesaid note, *and directed him to go to George W. Faris, and inform him that she would not pay any other or further sum thereon.*" Mr. Faris apparently had many interviews after this time with Mr. Lamson, and also several with Mrs. O'Toole. The failure of Lamson to testify that he did not notify Faris of Mrs. O'Toole's repudiation of the note is significant. The indorsement on the note, "Interest paid to March 11th, 1910," in the handwriting of Mr. Faris, will be remembered. At the preliminary hearing Lamson testified that he did not see Mr. Faris make this indorsement. At the final hearing he testified that the indorsement was made in his presence. Testifying concerning this indorsement Mr. Faris said that Lamson, upon its date, paid him *"about* $35 interest up to the 11th of March." The indorsement, it will be noticed, does not state the amount of the payment. It will be further noticed that Faris did not testify that he had no knowledge as to the source of this payment. These various

facts and circumstances necessarily have an important bearing upon the issue now being determined. Taken together, they create the impression or warrant the inference that there was concert of action between Anderson and Murray, on the one hand, and Lamson and Faris on the other; that is, that the four men were acting together in an endeavor to collect this note.

Whether Lamson was anything more than a mere broker in the transaction we need not determine, for both he and Faris, for reasons of their own, interviewed Mrs. O'Toole. She says, and her testimony is corroborated by that of her daughter, and still more strongly by the surrounding circumstances, that she informed these men that she had given the note to protect her son. It is inconceivable that these business men, one of them an attorney, having had their suspicions aroused, would have avoided questions calculated to elicit information concerning the facts leading up to the execution of the note, had they really desired such information. We think it quite apparent, from their testimony, that they were more concerned as to whether Mrs. O'Toole intended to repudiate the note than they were as to the circumstances surrounding its execution. Searching the whole record, we conclude that Mr. Faris has not sustained the burden resting upon him; in other words, that he is not a holder in due course.

There was neither ratification nor laches on the part of complainant. The $1,500 payment was made before the return of young O'Toole and while the conditions inducing her to execute the note remained unchanged, that is, while she was still acting under the original duress. No other payment on this note was made by her, and, at or before its maturity, she repudiated it. Further action by her was not necessary until the attempt to enforce payment on the note was made.

We conclude, therefore, that complainant is entitled to the relief prayed. The decree will be reversed, with costs, and the cause remanded for further proceedings not inconsistent with this opinion.      *Reversed and remanded.*